Filed 5/8/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069360 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD257646) |
| JOSE R. ARCE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy R. Walsh, Judge. Affirmed as modified.

Eric Anthony Dumars, under appointment by the Court of Appeal, for Defendant and Appellant.

Kathleen A. Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Heidi Salerno and Elizabeth Renner, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jose Rubio Arce is a citizen of the Republic of Mexico and a lawful resident of the United States. In 2015, he pled guilty to possession for sale of one kilo of heroin and one kilo of cocaine. Under the terms of his plea agreement, Arce agreed that he would be sentenced to a total term of five years in jail and that he

could ask the trial court to impose a "split sentence" under Penal Code[1] section 1170, subdivision (h)(5), which requires that in eligible cases a trial court suspend the concluding portion of a jail sentence and impose mandatory supervision.

At the time of his sentencing, the trial court considered Arce's request for a split sentence and denied it. The court noted that upon his release from physical custody, Arce was subject to deportation proceedings initiated by the United States Immigration and Customs Enforcement (ICE). The trial court found that, given the risk Arce would be deported during the period of any mandatory supervision, and thus not be subject to the probation department's supervision or able to participate in the rehabilitative services offered by the department, a split sentence was not a realistic disposition.

On appeal, Arce argues the trial court erred in finding his immigration status was a complete bar to a split sentence. Arce argues the trial court should have considered the possibility that he would be able to challenge his deportation and stay in this country either temporarily while his immigration status is litigated or, although unlikely, permanently. He notes that a number of other factors that show he was amenable to mandatory supervision, including the fact that he has been in this country lawfully since 2000, has no prior criminal record, is married to a United States citizen and has three children, all of whom are also United States citizens.

We agree with the trial court that a period of supervision following deportation is impractical and inconsistent with the goals and purposes of the legislation that mandates imposition of split sentences. Split sentences are the preferred disposition in eligible

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

cases because they provide released prisoners with close supervision and supportive services designed to substantially reduce the risk of recidivism. As a practical matter, such supervision and services are not available after a prisoner has been deported.

Because his conviction for possession for sale of heroin and cocaine makes Arce subject to mandatory deportation and mandatory detention under the terms of the Immigration and Nationality Act, the trial court did not err in denying his request for a split sentence.

We note the Attorney General concedes the trial court erred in imposing a $156 penalty assessment; accordingly, we vacate the assessment.

FACTUAL AND PROCEDURAL BACKGROUND

1. Investigation

On the morning of July 30, 2014, federal law enforcement officers observed the following: a PT Cruiser being driven by Jessica Lopez crossed the border from Mexico at the San Ysidro port of entry; the law enforcement officers followed it to a shopping mall garage in Chula Vista, where Lopez left the vehicle. Shortly thereafter, Arce got in the PT Cruiser and drove it to a Walmart parking lot.

A Nissan Frontier being driven by Oscar Rodriguez Gonzalez, and being observed by other officers, arrived at the Walmart parking lot at the same time Arce arrived in the PT Cruiser. Both Arce and Gonzalez went into the Walmart; when they came out, Arce drove off in the Nissan Frontier and Gonzalez left in the PT Cruiser. Shortly thereafter, the law enforcement officers stopped the PT Cruiser, searched it and found 16 taped bundles of illegal drugs in a spare tire, including more than a kilo of heroin and more than a kilo of cocaine.

3

2.  Plea

Gonzalez was arrested when the contraband was discovered.  Gonzalez, Arce and Lopez were later charged with, among other matters, possession for sale of more than a kilo of heroin and possession for sale of more than a kilo of cocaine in violation of Health and Safety Code sections 11351 and 11370.4, subdivision (a)(1).

Arce pled guilty to both possession for sale charges, and four other counts were dismissed.  Arce agreed he would be sentenced to a period of five years in jail.  The district attorney agreed Arce could request that his sentence be split under section 1170, subdivision (h)(5) but advised Arce's attorney he would oppose the request.

3.  Sentencing

Prior to his sentence, the probation department prepared a report that indicated Arce has been a lawful resident of the United States since he arrived here in 2000.  The probation report stated:  "When defendant is remanded into custody, ICE will place a hold on him until he is released, at which time he will be processed for deportation to Mexico."  The probation report also noted that Arce had no prior criminal record.  The probation report further stated:  "Absent his immigration status, the recommendation in this case would be a split sentence pursuant to PC1170(h)(5)(B), with two years in custody, followed by three years of mandatory supervision."

Arce filed a statement in mitigation in which he argued that notwithstanding the prospect that following his release he would be subject to deportation proceedings, the trial court should nonetheless impose a split sentence of one year of custody and four years of managed supervision.

As we indicated at the outset, the trial court declined to impose a split sentence.  In

4

particular, although the court noted that in many respects Arce was suitable for imposition of a split sentence, the risk he would be deported undermined the likelihood he would be subject to the managed supervision provided by section 1170, subdivision (h)(5) and the benefits and protections such supervision would provide both the public and Arce. In reaching this conclusion, the trial court noted that managed supervision provides a great deal of prerelease support and a very high degree of monitoring by the probation department upon a prisoner's release.[2]

## DISCUSSION

When, as here, sentencing is pursuant to section 1170, subdivision (h), the court *must* impose a split sentence "[u]nless the court finds that, in the interests of justice, it is not appropriate in a particular case." (§ 1170, subd. (h)(5).) Section 1170, subdivision (h) was enacted as part of the 2011 Realignment Legislation (stats. 2011, ch. 15, § 1; hereafter Realignment). In adopting Realignment, the Legislature added section 17.5, which states:

"(a) The Legislature finds and declares all of the following:

"(1) The Legislature reaffirms its commitment to reducing recidivism among criminal offenders.

"(2) Despite the dramatic increase in corrections spending over the past two decades, national reincarceration rates for people released from prison remain unchanged or have worsened. National data show that about 40 percent of released individuals are

---

[2] Gonzalez and Arce were sentenced on the same day, but separately. Gonzalez was sentenced first, and, when the trial court sentenced Arce, the trial court incorporated by reference the findings it made in denying Gonzalez's similar request for a split sentence.

5

reincarcerated within three years.  In California, the recidivism rate for persons who have served time in prison is even greater than the national average.

"(3) Criminal justice policies that rely on building and operating more prisons to address community safety concerns are not sustainable, and will not result in improved public safety.

"(4) California must reinvest its criminal justice resources to support community-based corrections programs and evidence-based practices that will achieve improved public safety returns on this state's substantial investment in its criminal justice system.

"(5) Realigning low-level felony offenders who do not have prior convictions for serious, violent, or sex offenses to locally run community-based corrections programs, which are strengthened through community-based punishment, evidence-based practices, improved supervision strategies, and enhanced secured capacity, will improve public safety outcomes among adult felons and facilitate their reintegration back into society.

"(6) Community-based corrections programs require a partnership between local public safety entities and the county to provide and expand the use of community-based punishment for low-level offender populations.  Each county's Local Community Corrections Partnership, as established in paragraph (2) of subdivision (b) of Section 1230, should play a critical role in developing programs and ensuring appropriate outcomes for low-level offenders.

"(7) Fiscal policy and correctional practices should align to promote a justice reinvestment strategy that fits each county.  'Justice reinvestment' is a data-driven approach to reduce corrections and related criminal justice spending and reinvest savings in strategies designed to increase public safety.  The purpose of justice reinvestment is to

6

manage and allocate criminal justice populations more cost-effectively, generating savings that can be reinvested in evidence-based strategies that increase public safety while holding offenders accountable.

"(8) 'Community-based punishment' means correctional sanctions and programming encompassing a range of custodial and noncustodial responses to criminal or noncompliant offender activity. Community-based punishment may be provided by local public safety entities directly or through community-based public or private correctional service providers, and include, but are not limited to, the following:

"(A) Short-term flash incarceration in jail for a period of not more than 10 days.

"(B) Intensive community supervision.

"(C) Home detention with electronic monitoring or GPS monitoring.

"(D) Mandatory community service.

"(E) Restorative justice programs such as mandatory victim restitution and victim-offender reconciliation.

"(F) Work, training, or education in a furlough program pursuant to Section 1208.

"(G) Work, in lieu of confinement, in a work release program pursuant to Section 4024.2.

"(H) Day reporting.

"(I) Mandatory residential or nonresidential substance abuse treatment programs.

"(J) Mandatory random drug testing.

"(K) Mother-infant care programs.

"(L) Community-based residential programs offering structure, supervision, drug treatment, alcohol treatment, literacy programming, employment counseling,

7

psychological counseling, mental health treatment, or any combination of these and other interventions.

"(9) 'Evidence-based practices' refers to supervision policies, procedures, programs, and practices demonstrated by scientific research to reduce recidivism among individuals under probation, parole, or post release supervision.

"(b) The provisions of this act are not intended to alleviate state prison overcrowding."

We set forth these legislative findings in full because plainly they must inform our interpretation and application of section 1170, subdivision (h)(5). The Legislature's Realignment findings demonstrate the Legislature's principal concern was in reducing the rate of recidivism among nonviolent low-level offenders; the findings further manifest the Legislature's determination that local confinement of such offenders and their participation in local programs and supervision will improve their ability to successfully reintegrate into society.

We must also consider the Judicial Council's adoption of California Rules of Court, rule 4.415, which states:

"(a) **Presumption** Except where the defendant is statutorily ineligible for suspension of any part of the sentence, when imposing a term of imprisonment in county jail under section 1170(h), *the court must suspend execution of a concluding portion of the term to be served as a period of mandatory supervision unless the court finds, in the interests of justice, that mandatory supervision is not appropriate in a particular case.* Because section 1170(h)(5)(A) establishes a statutory presumption in favor of the imposition of a period of mandatory supervision in all applicable cases, *denials of a*

8

*period of mandatory supervision should be limited.*

"(b) **Criteria for denying mandatory supervision in the interests of justice** In determining that mandatory supervision is not appropriate in the interests of justice under section 1170(h)(5)(A), the court's determination must be based on factors that are specific to a particular case or defendant. Factors the court may consider include:

"(1) Consideration of the balance of custody exposure available after imposition of presentence custody credits;

"(2) The defendant's present status on probation, mandatory supervision, postrelease community supervision, or parole;

"(3) Specific factors related to the defendant that indicate a lack of need for treatment or supervision upon release from custody; and

"(4) Whether the nature, seriousness, or circumstances of the case or the defendant's past performance on supervision substantially outweigh the benefits of supervision in promoting public safety and the defendant's successful reentry into the community upon release from custody.

"(c) **Criteria affecting conditions and length of mandatory supervision** In exercising discretion to select the appropriate period and conditions of mandatory supervision, factors the court may consider include:

"(1) *Availability of appropriate community corrections programs*;

"(2) Victim restitution, including any conditions or period of supervision necessary to promote the collection of any court-ordered restitution;

"(3) Consideration of length and conditions of supervision to promote the successful reintegration of the defendant into the community upon release from custody;

9

"(4) Public safety, including protection of any victims and witnesses;

"(5) Past performance and present status on probation, mandatory supervision, postrelease community supervision, and parole;

"(6) The balance of custody exposure after imposition of presentence custody credits;

"(7) Consideration of the statutory accrual of post-sentence custody credits for mandatory supervision under section 1170(h)(5)(B) and sentences served in county jail under section 4019(a)(6);

"(8) The defendant's specific needs and risk factors identified by a validated risk/needs assessment, if available; and

"(9) The likely effect of extended imprisonment on the defendant and any dependents.

"(d) **Statement of reasons for denial of mandatory supervision** Notwithstanding rule 4.412(a), when a court denies a period of mandatory supervision in the interests of justice, the court must state the reasons for the denial on the record." (Italics added.)

We agree with the trial court's conclusion that while a prisoner is outside the United States, the mandatory supervision provided for in section 1170, subdivision (h) is not, as a practical matter, possible and was not contemplated by the Legislature when it adopted Realignment.  Given the nature of the supervision and programs expressly envisioned by the Legislature (see § 17.5), we cannot believe the Legislature expected they could or would be provided remotely following deportation.

In this regard, it is significant that defendants subject to deportation due to

10

conviction of drug offenses have consistently been found ineligible for probation: "The courts have long recognized that the decision whether to grant probation to a deportable alien presents special issues. In *People v. Sanchez* (1987) 190 Cal.App.3d 224, the Court of Appeal held that a defendant's status as an illegal alien is highly relevant to the issue of whether to grant probation because it bears directly on whether the defendant can comply with the terms of probation. (*Id*. at pp. 230-231.) The appellate court observed that '[w]hen dealing with an illegal . . . alien, the trial judge must assume, barring presentation of . . . credible evidence to the contrary, a defendant will be deported upon completion of any term of incarceration imposed,' and that deportation is especially likely 'where a defendant is convicted of possession or sale of a controlled substance.' (*Id*. at p. 230; see also *People v. Cisneros* (2000) 84 Cal.App.4th 352, 358 [defendant's illegal alien status is an appropriate factor to consider in deciding whether to offer drug treatment under a discretionary program].) In this case, the strong probability that defendant will be deported before he can satisfy the drug treatment condition of his probation would entirely frustrate the objectives of Proposition 36. (See *People v. Esparza* (2003) 107 Cal.App.4th 691 [trial court not required to engage in the superfluous act of placing defendant on Prop. 36 probation when he cannot participate in the treatment program required as a condition of that probation].)" (*People v. Espinoza* (2003) 107 Cal.App.4th 1069, 1074-1075.)

Importantly, the trial court in no sense abused its discretion in concluding Arce will, in all likelihood, be detained and deported following his release from physical custody. In particular, we note that, given Arce's conviction of possession of heroin for sale and possession of cocaine for sale, Arce is subject to both mandatory deportation and

11

mandatory detention pending his removal. (See Immig. & Nat. Act, §§ 236-239; 8 U.S.C. §§ 1226-1229.) His convictions for possession for sale of heroin and cocaine render him deportable. (See 8 U.S.C. § 1227(a)(2)(B); see also 8 U.S.C. § 1101(a)(43).) Thus, the Attorney General is required to initiate proceedings against him as "expeditiously as possible after the date of conviction." (8 U.S.C. § 1229(d)(1).) Importantly, under the express terms of the Immigration and Nationality Act, the Attorney General may not cancel removal proceedings against him. (8 U.S.C. § 1229b(b).) As our own Supreme Court recently stated: "Under the Immigration and Nationality Act (8 U.S.C. § 1101 et seq.), '[a]ny alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State, the United States or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable' (8 U.S.C. § 1227(a)(2)(B)(i)), and any such deportable alien 'shall, upon the order of the Attorney General, be removed' (8 U.S.C. § 1227(a)). These provisions, as the United States Supreme Court has observed, 'specifically command[ ] removal for all controlled substances convictions except for the most trivial of marijuana possession offenses.' (*Padilla v. Kentucky* (2010) 559 U.S. 356, 368 (*Padilla*).) Although the Attorney General of the United States has limited discretion to cancel the removal of certain noncitizens, *he has no power to cancel the removal of nonpermanent residents convicted of most controlled substance offenses*. (8 U.S.C. § 1229b(b).)" (*People v. Patterson* (2017) 2 Cal.5th 885, 895, italics added (*Patterson*).)[3]

---

[3]    In both *Padilla* and *Patterson*, the defendants were longtime lawful permanent residents charged with drug offenses; on the advice of their respective criminal attorneys,

Thus, we cannot adopt Arce's suggestion we should nonetheless remand this case to permit him to make a showing he will not be subject to deportation upon his release. Not only does the express language of Immigration and Nationality Act provide no relief from deportation, that strict interpretation has been adopted both by the United States Supreme Court and, in turn, our own Supreme Court. (See *Padilla*, *supra*, 559 U.S. at p. 368; *Patterson*, *supra*, 2 Cal.5th at p. 895.) In light of the strict provisions of the Immigration and Nationality Act and the manner in which they have been interpreted, we are in no position to question the trial court's conclusion that, following his release from physical custody, Arce will be detained and removed from the country.[4]

each pled guilty to a drug offense. At the time of their respective pleas, neither of their attorneys advised them that the pleas would make them subject to mandatory deportation. In *Padilla*, the court held that counsel's failure to advise the defendant about the immigration consequences of his plea would support a claim that the defendant did not receive the effective assistance of counsel. (*Padilla*, *supra*, 559 U.S. at pp. 373-374.) In *Patterson*, the court held that, notwithstanding a mandatory admonition that the plea carried a risk of deportation (§ 1016.5), the defendant's ignorance with respect to the mandatory deportation required under the Immigration and Nationality Act nonetheless supported a later motion to withdraw his plea under section 1018. (*Patterson*, *supra*, 2 Cal.5th at p. 898.)

[4]    Neither the holding nor the rationale of *People v. Superior Court* (*Perez*) (1999) 75 Cal.App.4th 394, is in any sense controlling here. In *Perez*, a legal immigrant was subject to a petition under the Sexually Violent Predators Act (Welf. & Institutions Code, § 6600 et seq.; SVPA). He argued that the SVPA petition should be dismissed because he had committed an aggravated felony, and, on his release from custody as a criminal, he was subject to mandatory deportation under Title 8 United States Code sections 1228 and 1229. The court disagreed and, relying on the United States Supreme Court's opinion in *Reno v. American-Arab Discrimination Comm.* (1999) 525 U.S. 471, 483-485, found that notwithstanding the mandatory provisions of Title 8 United States Code sections 1228 and 1229, the United States Attorney General nonetheless retained the power to defer deportation proceedings in his case. (*Perez*, at p. 400.)

We in no sense question the holding in *Perez* that likely deportation proceedings are not grounds for dismissing an SVPA petition. That holding on its face has no application here where the trial court was required to determine the entirely distinct issue

13

We are mindful Arce's detention and deportation following his release is not a matter of factual certainty. (See, e.g., *Martinez-Done v. McConnell* (2014) 56 F.Supp.3d 535, 548.) Following Arce's release from custody, it is possible for any number of reasons that Arce may not actually be detained by federal immigration officials and thereafter deported. (*Ibid.*) However, we are not in a position to predict that such a period—when Arce will no longer be in physical custody and not yet subject to deportation proceedings—will occur.

Because the supervision and programs contemplated by Realignment cannot be administered following deportation and the trial court could reasonably find that Arce is subject to deportation following his release from physical custody, the trial court did not err in denying Arce's request for a split sentence.

---

of whether, as a practical matter, upon Arce's early release the unique conditions and services required under Realignment can be enforced and provided.

    In light of *Padilla* and *Patterson*, we do question the rationale of *Perez.* The court's conclusion that the Attorney General has discretion with respect to noncitizens convicted of deportable offenses has been substantially undermined by the contrary conclusions reached in both *Padilla* and *Patterson*.

DISPOSITION

The judgment of conviction is modified to delete the $156 penalty assessment; as modified, the judgment is affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.