Filed 9/9/21

CERTIFIED FOR PARTIAL PUBLICATION*


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D076919 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF002040) |
| ALICIA HARO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed; remanded for resentencing.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

---

\*      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.A–B and D.

# I.

# INTRODUCTION

A jury convicted defendant Alicia Haro of multiple drug related offenses after she crossed into the United States from Mexico on three occasions while transporting large amounts of methamphetamine hidden in her vehicle. She was sentenced to 21 years in prison.

On appeal, Haro raises four claims. First, Haro contends that the trial court erred in allowing a drug trafficking expert to testify that he did not believe that a drug organization would entrust large quantities of valuable drugs to an individual who had no knowledge of what they were transporting.

Second, Haro contends that the trial court erred when it declined to disclose private juror information after defense counsel asserted that an alternate juror approached her following the reading of the verdict and told her that some of the jurors had discussed the case before deliberations began.

Third, Haro contends that the trial court erred when it aggregated two 10-kilogram enhancements that had been pled and proven with respect to separate charged counts of conspiracy and instead imposed the sentence for a single 20-kilogram weight enhancement, given that the court dismissed one of the conspiracy counts after the jury determined that the two charged conspiracies were in fact part of a single conspiracy.

Finally, Haro contends that the trial court abused its discretion when it determined that she was ineligible for a split sentence because of her immigration status.

We conclude that Haro's first two contentions are without merit. However, we agree with Haro that the trial court erred in imposing a 20-kilogram weight enhancement under Health and Safety Code section 11370.4, subdivision (a)(4), because the accusatory pleading failed to provide

2

Haro with notice that she could be subject to such an enhancement with respect to any charged count. We therefore conclude that this enhancement must be stricken, the sentence vacated, and the matter remanded for resentencing. Given our vacatur of Haro's sentence and our limited remand for resentencing, we conclude that we need not consider Haro's final argument.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *The facts underlying counts 1, 2 and 3*

On October 13, 2018, Haro crossed into the United States from Mexico at the Calexico port of entry. Haro was driving a blue Honda CR-V. Her daughter Kenia Haro was in the vehicle with her. After entering the United States, Haro made a stop at a Circle K gas station and another stop at an Arco gas station. She then drove to the Ontario Mills Mall. Haro took an indirect route to the mall. A narcotics task force special agent testified that drug traffickers often take indirect routes to their destinations in order to avoid checkpoints. After Haro arrived at the Ontario Mills Mall, she parked, put the key to the vehicle in the cup holder and left the CR-V unlocked. She then went inside the mall. The special agent explained that drug traffickers frequently use this mall because of its large size, ample parking, and its proximity to a major freeway.

While Haro was inside the mall, Jonathan Bejarano arrived at the location and approached the CR-V.[1] Bejarano got into the vehicle, drove away from the mall, and then returned. Upon returning to the mall,

---

[1] At Haro's trial, Bejarano testified as a cooperating witness for the prosecution.

Bejarano removed several bags from the CR-V and put them inside a grey Camry.

An officer who had been surveilling the Camry was asked to stop the vehicle. The driver led the officer on a high-speed chase. The officer was eventually able to pull over the Camry and arrest the driver, Jesus Bayardo. Investigators discovered 43 pounds (19.5 kilograms) of methamphetamine inside the Camry.

2. *The facts underlying counts 4, 5 and 6*

On December 7, 2018, Haro crossed into the United States from Mexico at the Calexico port of entry. On this occasion, Haro was driving a white CR-V. Haro's daughter Kenia and her niece Andrea were riding in the vehicle with her. Haro made stops at an Arco gas station, a Circle K gas station, and an AM/PM gas station before driving to a mall in Moreno Valley. Haro parked in a mall parking lot and she and her passengers entered the mall. Haro left the keys to the CR-V in the cup holder. Bejarano arrived and drove the CR-V to a nearby ranch. At the ranch, Bejarano and another man took bags out of the CR-V and loaded them into a pickup truck. Bejarano then returned the vehicle to the same parking spot at the mall where Haro had parked and left the keys in the cup holder. Officers later searched the pickup truck and found 21 packages of methamphetamine that weighed 38.5 pounds (17.5 kilograms).

3. *Evidence Code section 1101 evidence regarding Haro's travels from Mexico into the United States on a third occasion*

At trial, additional evidence was introduced regarding another date on which Haro drove a blue CR-V from Mexico into the United States, to Phoenix, through the Calexico port of entry, but for which she was not

charged in this case.[2] On November 3, 2018, Haro was driving the blue CR-V with three passengers in the vehicle—Kenia Haro, Alicia Haro, and Guadalupe Haro. After Haro crossed the border, she pulled into a gas station in Calexico, and then drove east to a gas station in Yuma, Arizona. Haro later stopped at another gas station in Gila Bend, Arizona. Haro continued to drive until she reached the Arizona Mills Mall, which is near Phoenix. According to a narcotics detective, drug traffickers frequent this mall because it is a large and busy area, and there is easy access to a freeway.

Once parked at the mall, Haro made a phone call and then went inside the mall with her passengers, where they stayed for about five hours. After leaving the mall, Haro and her passengers got into the blue CR-V. Haro was talking on her cell phone while she was driving and pulled in and out of several parking lots. Haro appeared to be "looking for something or somebody." Haro eventually parked in front of a "meat market." Bejarano arrived shortly thereafter. Haro handed him something, and he drove away in the CR-V. Detectives were observing the vehicle and followed Bejarano as he drove it to a nearby house. After Bejarano left with the vehicle, Haro and her passengers waited at a bus stop. Bejarano later returned to the parking

---

[2]     The trial court excluded this evidence from the People's case-in-chief, but ruled that it would be admissible in rebuttal, "depending upon what the defense case is." The court noted that this evidence would not be admitted if the "defense doesn't open the door to character or other conduct . . . ." After the defense's cross-examination of multiple witnesses, the trial court revisited this in limine ruling and concluded that because the defense had suggested that Haro was a blind mule during cross-examination of the prosecution's witnesses, the door had been opened with respect to the evidence of Haro's trip to Phoenix. The court explained that in its view, evidence about the Phoenix trip was relevant, and not more prejudicial than probative, and that the prosecution would therefore be permitted to present evidence regarding the Phoenix trip in their case-in-chief.

lot of the meat market in the CR-V. Haro and her passengers got into the vehicle and drove away.

Four days after Bejarano drove the CR-V to the nearby residence, detectives were surveilling the home and executed a search warrant. They found 44.2 pounds (20 kilograms) of methamphetamine in a back house on the property.

4. *Haro's statements to police*

On March 27, 2019, agents arrested Haro. Haro waived her rights and agreed to speak with the agents. Haro's comments made agents think that she was "fishing for information," in that she seemed to be "trying [to] find out what [the agents] kn[e]w before answering the question[s]." Haro told the agents that she had been paid between $1,000 and $1,500 for each trip from Mexico to the United States. Haro said that she had been going shopping at the malls where she parked, but she acknowledged to the agents that there would be no way for them to confirm her story. Haro told the agents that her expectation was that someone was going to "pick up some invoices" from the vehicles that she had been driving. She admitted, however, "that she was doing something illegal," because, she told them, "she just probably didn't know what the invoices were for or what was in the invoices." When asked why she was "doing this illegal activity," Haro gestured with her hand in a way that the agents understood to be a reference to "money." Haro also admitted that she had been provided with disposable cell phones to use during her trips, and that the person who gave her the disposable cell phones "swaps the cell phones frequently."

5. *Expert testimony on narcotic trafficking organizations*

A California Highway Patrol Officer who is a special agent with the Imperial County Narcotics Taskforce testified at trial. The agent testified

about his extensive experience dealing with criminal drug trafficking cases. He explained that drug couriers are frequently given minimal information, and often do not know "where the stash house is." This way, there is "less possibility they'll get busted." Drug traffickers often ensure that the individuals involved in the transportation of the drugs "know as little as possible" so that they have little information to share with law enforcement if they are caught.

The agent explained that drug traffickers will often employ a pattern of having drivers cross from Mexicali in Mexico to Calexico in the United States, and then drive to other counties. Drivers will often park at public places like a restaurant or mall, go inside, and wait for a second person to unload the drugs from the vehicle that was used to transport them. A courier will often stop several times after crossing the border in order to determine whether he or she is being followed. Sometimes the drivers bring family members or children along to serve as decoys.

The agent offered his opinion that there was nothing "unusual" about this case, and that it was a "textbook narcotic[s] investigation." He offered that, based on his training and experience, he could not imagine any scenario in which "a drug trafficking organization would use an unknowing driver, who does not know there are narcotics in the car, to cross multiple times with dozens of kilos of narcotics to various cities within the United States."

6. *Haro's defense*

Haro called attorney Russell Babcock to testify as an expert on drug trafficking. He stated that drug organizations sometimes use unknowing couriers, known as "blind mules," to transport drugs into the United States. The unknowing couriers are not aware that they are transporting drugs.

7

Haro also called several coworkers, neighbors, and friends who testified to her good character.

In addition, Haro testified in her own defense. She explained that after she retired from her 30-year job as a nurse in Mexicali, she began to look for a part-time job through classified advertisements in a local newspaper because she wanted to do something different from nursing. She responded to an advertisement seeking someone between the ages 40 and 50 to do "general work." The following day she met with a man at a Burger King near her home. He told her that the job would entail traveling to the United States and "carry[ing] clothing and invoices," and that "it was a matter of taking -- taking them and bringing them back." According to Haro, the man assured her that the job would be easy and "completely legal." Haro said that the job that the man was offering her did "not seem so odd" to her. As part of the job, the man would provide her with a car to use.

The man provided Haro with a 2009 Honda CR-V. She had possession of that vehicle for an unspecified period of time, until the man asked for it back the day before she was going to cross the border. He told her that he wanted to take the vehicle to have some maintenance work done so that Haro "would feel calm about it" for her trip. The following day, after the man returned the vehicle to her, Haro drove it across the border, to the Ontario Mall. Haro testified that the reason that she made multiple stops at gas stations and convenience stores was to buy soda and gas. She explained that the soda was cheaper at one location, while gas was cheaper at another. At the mall, Haro shopped for clothes that she took back to Mexico. Haro denied having left the vehicle unlocked or the keys inside when she went into the mall.

Before Haro made her drive to Arizona, the man who had hired her again took the vehicle from her prior to her trip so that he could perform maintenance on it. Haro testified that she made a number of stops on that occasion in order to purchase soda, gas, and to use the restroom. Haro further testified that approximately 20 minutes before she arrived at the mall, "everything in the car started to mess up" and she thought that the vehicle was "going to break down." Haro called the man who had hired her and told him "that the car was not working right." Haro claimed that she drove to the "meat market" because the man who hired her had told her that there was someone near that location who could pick up the "invoices" and check on the vehicle. A man met Haro there and told her that he was going to "check" the vehicle. He got into the car and drove away. When the man returned with the vehicle, Haro drove it back to Mexico.

For the final trip that Haro made, which was the trip that occurred on December 7, 2018, Haro used her own CR-V. Haro was told that the CR-V that the man had previously given Haro to use had been stolen. The man asked Haro to "lend him [her] vehicle because he was going to do service on it . . . ." After the man returned the car, Haro crossed the border, shopped for clothes, and brought them back to Mexico. Haro testified that after this final trip, the man with whom she had been working called to ask her "for a favor." He wanted Haro to transport drugs across the border. Haro said that she became angry and refused to do it. The man assured her that she had not transported drugs on her previous trips. After that conversation, Haro did not speak with the man again.

Haro testified that she did not know Bejarano and that she had never seen him before the trial.

9

During cross-examination, the prosecutor asked Haro about a video chat that she had from the jail with her daughter Kenia. Haro admitted that during that video chat, she had held up a piece of paper that said, " 'Kenia, they took the car to look at it because it was having problems, and you never saw the person who took it.' "

B. *Procedural background*

Haro was charged in an amended information with one count of transporting methamphetamine for sale to a noncontiguous county (Health & Saf. Code, § 11379, subd. (b); count 1); one count of importing methamphetamine (Health & Saf. Code, § 11379, subd. (a); count 4); two counts of possession of methamphetamine for sale (Health & Saf. Code, § 11378; counts 2, 5); one count of conspiracy to transport methamphetamine to a noncontiguous county (Health & Saf. Code, § 11379, subd. (b); Penal Code, §182, subd. (a)(1); count 3); and one count of conspiracy to transport methamphetamine (Health & Saf. Code, § 11379, subd. (a); Penal Code, §182, subd. (a)(1); count 6).[3] The information alleged with respect to each count that each offense involved more than 10 kilograms of methamphetamine (Health & Saf. Code, § 11370.4, subd. (b)(3)).

A jury found Haro guilty on all counts, and found true the enhancement allegations regarding the 10-kilogram weight of the methamphetamine involved with respect to each count. The jury also found that the conspiracies charged in counts 3 and 6 were "[o]ne [s]ingle [c]onspiracy," rather than separate conspiracies.

The trial court sentenced Haro to a term of 21 years in prison, comprised of the midterm of 6 years on count 3, plus a 15-year enhancement

---

3       The amended information also charged Kenia Haro with the same counts.

because the weight of the drugs that Haro had transported totaled more than 20 kilograms.

Haro filed a timely notice of appeal.

## III.

## DISCUSSION

A. *The trial court did not abuse its discretion in admitting expert testimony that drug trafficking organizations would not allow an unknowing individual to transport large quantities of drugs*

Haro contends that the trial court prejudicially abused its discretion when it admitted expert testimony "that Haro knew the drugs were in the car." If Haro's description of the testimony that the trial court allowed were accurate, her point may have been well taken. However, as we describe further below, the trial court did not allow an expert to testify regarding what Haro knew. Rather, the court allowed the expert to provide an opinion, based on his training and experience, as to whether a drug trafficking organization would entrust large amounts of drugs to an unknowing courier. Haro has not demonstrated that that court abused its discretion in admitting this testimony.

### 1. *Additional procedural background*

Prior to trial, the prosecutor moved to permit an expert to testify about drug trafficking organizations and their use of "so-called blind mule narcotics couriers." Haro objected to the proposed expert testimony and argued that whether Haro was a blind mule was an ultimate issue in the case. The trial court partially sustained Haro's objection, ruling that the expert's testimony that Haro was not a blind mule was "an opinion" that would be "essentially what the jury is going to decide" and was therefore not admissible. However, the expert would be permitted to "talk about the factors and how the cartels work and all the other things that go with how the cartels and drug

11

trafficking organizations work . . . ." The court reserved ruling on whether the expert would be permitted to testify that "he would not expect a drug trafficking organization to use a blind mule."

At trial, the expert testified that there was nothing "unusual about this investigation" and instead, that this was a case of "textbook narcotics trafficking." He had "investigated several cases with the same pattern, the same method, and the same type of compartments [in which to conceal drugs] . . . ." After the expert provided this testimony, the prosecutor asked him whether, based on his training and experience, he could imagine a scenario "in which a drug trafficking organization would use an unknowing driver, [i.e., a driver] who does not know there are narcotics in the car, to cross multiple times with dozens of kilos of narcotics to various cities within the United States?" The expert responded, "No." When the prosecutor asked, "Why would they not do that?" the expert replied, "The risk." At this point, defense counsel objected that the question called for speculation. The trial court overruled the objection. The expert continued, "The risk. There's too much money and product involved." The prosecutor then asked, "What would be the problem with using an unknowing courier to cross narcotics from Mexico all the way up to, say, San Bernardino or -- or Phoenix?" The expert answered, "Who knows where they're going, what route they're taking, and what checkpoint they're going to cross through. Normally, they [the drug trafficking organizations] want to have control of the routes, when [the couriers] go, where they stop, and so on." After asking a few additional questions, the prosecutor followed up with two questions: "So the -- the risk is that they go somewhere else?" and, "And that drug trafficking organization could lose control of the narcotics?" The expert answered "Yes" to both questions.

12

2.  *Relevant law*

A trial court has wide discretion to admit or exclude expert testimony (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506), and a ruling on this matter "will not be disturbed on appeal absent a showing that the court abused its discretion in a manner that resulted in a miscarriage of justice" (*People v. Robinson* (2005) 37 Cal.4th 592, 630).

An expert may testify to an opinion based upon facts shown by the evidence and restated in a hypothetical question asking the expert to assume the truth of those facts. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946 (*Gonzalez*).) However, an expert may not provide an opinion that the defendant had particular knowledge or a specific intent. (*Ibid.*; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1513.)

3.  *Analysis*

Haro attempts to frame the expert's opinion testimony as providing "an opinion on Haro's mental state." We reject this characterization of the expert's testimony. The expert testified that it was his opinion that *a drug organization* would not entrust a large quantity of drugs to an unknowing courier, and he provided support for such an opinion. Although one could infer something about Haro's knowledge, or lack thereof, from the expert's opinion testimony, his testimony was not, itself, an opinion regarding her mental state or knowledge. (See *Gonzalez, supra*, 38 Cal.4th 932 [fact that expert's opinion that gangs, generally, intimidate gang members who are called to testify could lead a jury to find that witnesses in that case were being intimidated and could cause jury to credit witnesses' original statements as opposed to their later repudiation, did not mean that the testimony was about whether the witnesses in that case "had been intimidated" and therefore, did not render the opinion inadmissible].)

In fact, in *People v. Romo* (2016) 248 Cal.App.4th 682 (*Romo*), a panel of this court rejected a defendant's contention that his trial counsel was ineffective for failing to object to an expert witness's opinion "that [the] defendant was not a blind mule under the circumstances of [that] case." (*Id.* at p. 697.) As the *Romo* court explained, the agent who testified "did not opine on [the] defendant's guilt or innocence," but instead "relied on various factors to opine that [the] defendant was not a blind mule, including the quantity, type and location of the drugs found in [the] defendant's car" and other factors, such as the lack of a GPS device to track the large quantity of drugs. (*Ibid.*) Significantly, in *Romo*, the defense called its own witness, who testified about " 'typical' blind mule case[s]" and opined that the defendant had in fact been a blind mule. (*Id.* at p. 698.) The *Romo* court concluded that if it was proper for the defense to offer expert opinion evidence that the defendant was a blind mule based on the defense expert's knowledge and experience regarding drug trafficking organizations, it was equally proper for the prosecution to elicit evidence on this same subject. (*Ibid.*)

The opinion offered by the prosecution's expert in this case was less a comment on the mental state or knowledge of the defendant than the expert opinion testimony that was approved in *Romo*. Unlike in *Romo*, where the prosecution expert opined that the defendant was not a blind mule, here, the expert offered his opinion as to how a drug trafficking organization would operate, and whether such an organization would be willing to accept the risk that would be involved in utilizing an unknowing courier to transport large, quantities of valuable drugs. Although there remains a question as to whether it would be proper for an expert to testify, as the prosecution expert did in *Romo,* that a particular defendant was not a blind mule if the defense

14

were not presenting an expert to testify that the defendant was a blind mule, we conclude that the prosecution's expert testimony in this case was proper.[4]

To the extent that Haro suggests that the expert's opinion was unnecessary because this was a " 'textbook' . . . case," making the testimony "not necessary or helpful to the jury here," we reject such a contention. Haro's argument assumes that what is common knowledge to a drug enforcement agent is similarly common knowledge to a layperson. However, an ordinary juror would not have knowledge of the inner workings of a drug trafficking organization, let alone what amount of methamphetamine an organization might or might not entrust to an unknowing courier. Whether a drug trafficking organization would be likely to entrust quantities of drugs such as those involved in this case to someone who was not aware that he or she was transporting illicit drugs is sufficiently beyond common experience that a trial court could reasonably conclude that expert opinion would assist the jury.

Haro argues that *United States v. Valencia-Lopez* (9th Cir. 2020) 971 F.3d 891 supports her contention that the expert's challenged testimony should not have been admitted. We disagree. The issue in *Valencia-Lopez* was whether the district court had appropriately determined that the expert testimony offered in that case was reliable under federal law. (*Valencia-*

---

[4] Like the defendant in *Romo*, Haro called her own expert who testified about blind mules, although Haro's expert, unlike the expert in *Romo*, did not specifically opine that the defendant was a blind mule. Rather, he offered his opinion that drug trafficking organizations sometimes do use blind mules to transport drugs across the border. Thus, both the defense expert and the prosecution expert testified regarding how drug trafficking organizations operate to move drugs from Mexico into the United States. As *Romo* explained, it is not improper for the prosecution to call an expert witness to testify on a point such as this where the defendant also presents evidence on the subject. (*Romo, supra*, 248 Cal.App.4th at p. 698.)

15

*Lopez, supra*, 971 F.3d at pp. 894–895.) The federal district court had made no findings with respect to the reliability of the expert's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, as required under the Federal Rules of Evidence. (*Valencia-Lopez,* at pp. 897–898.) The Ninth Circuit Court of Appeals determined that the district court's failure to make a reliability finding constituted an abdication of the trial court's gatekeeping role; it was this abdication of the gatekeeping role that constituted an abuse of discretion in that case. (*Id.* at pp. 899–901.) This case does not involve the same evidentiary rules as *Valencia-Lopez*, and *Valencia-Lopez* does not stand for the proposition that expert opinion evidence such as the testimony that Haro challenges is inadmissible as a matter of law. In fact, the *Valencia-Lopez* court specifically acknowledged that it was not questioning the admissibility of expert modus operandi testimony in drug smuggling cases involving unknowing or coerced couriers. (*Id.* at p. 901.) We therefore conclude that *Valencia-Lopez* does not assist Haro in seeking to establish that the trial court abused its discretion under state law by permitting the prosecution to present expert testimony that drug trafficking organizations would not be willing to risk using an unknowing courier to transport the quantities of drugs that were transported in this case.

Further, even if we were to assume that the trial court erred in admitting the expert's opinion that a drug trafficking organization would not use an unknowing courier to transport large quantities of drugs, we would nevertheless conclude that Haro cannot demonstrate prejudice. We review the erroneous admission of expert testimony for prejudice under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v.*

16

*Pearson* (2013) 56 Cal.4th 393, 446.)[5]  Under this standard, an error

warrants reversal of the judgment only if the court determines that it is

reasonably probable that a result more favorable to the appealing party

would have been reached in the absence of the error.  (*Watson, supra*,

46 Cal.2d 818, 836.)

    We conclude that Haro would not have obtained a more favorable result

absent the admission of the expert's opinion.  There was abundant evidence

of Haro's knowing participation in a criminal scheme to transport illicit drugs

into the United States.  Haro admitted that she took a "job" from a man she

did not know, and that this person provided her with a vehicle and burner

cell phones.  She conceded when questioned by law enforcement officers that

she knew she was doing something illegal, and this statement was introduced

in evidence by the prosecution in rebuttal.  The man would take the vehicle

from Haro just before each trip.  Haro even allowed this man to take her own

vehicle when the vehicle that he had previously provided to her was

purportedly stolen.  This man would pay her $1,000 to $1,500 for each trip

across the border, a significant amount of money, given what she claimed

---

5    Haro argues that the admission of the expert's opinion on this matter
violated her Fourteenth Amendment right to due process and therefore,
should be assessed under the harmless beyond a reasonable doubt standard
of review set forth in *Chapman v. California* (1967) 386 U.S. 18.  She asserts
that the alleged error violated her rights because the expert's testimony
"invaded the province of the jury" when he expressed his opinion that Haro
knew that she was transporting illegal drugs.  As we have explained, we
disagree with Haro that the expert witness's testimony involved commentary
on her knowledge or mental state.  Rather, based on his experience and
training, he offered his understanding of how drug trafficking organizations
typically operate.  The expert's opinion thus did not "invade[ ] the province of
the jury," and as a result, Haro's claim involves the application of ordinary
evidentiary rules and is entitled to prejudice review under only the *Watson*
standard.  (See *People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

17

were the reason she had been given for the trips (i.e., to transport "invoices" to the United States and to purchase clothing at retail prices in the United States to bring back to Mexico).

Further, at trial, Bejarano, one of the people involved in the scheme, testified that Haro would leave the vehicle unlocked, with the keys inside. She would then wait for hours while Bejarano took the vehicle that she had been driving and eventually returned it.

Additional details of Haro's testimony were demonstrably false. She testified that she had never seen Bejarano before the trial, but there was evidence demonstrating that she provided the car to Bejarano directly during her trip to the Arizona mall. She also testified that she had given the man her vehicle because it was in need of repair, but law enforcement surveilled the car, and it was never taken for repairs while out of her possession. When the vehicle was returned to her, she simply drove it back to Mexico. In addition, after her arrest, Haro tried to tell her daughter what to say about what had occurred by holding up a sign during a video call, telling her " 'Kenia, they took the car to look at it because it was having problems, and you never saw the person who took it.' " There would have been no need for Haro to attempt to surreptitiously provide her daughter with a story about what had occurred, including the part about not having seen " 'the person who took' " the vehicle, if that was what had actually occurred.

In sum, the evidence of Haro's knowing participation in a drug smuggling scheme was overwhelming. As a result, it is simply not probable that she would have obtained a more favorable result absent the expert's testimony regarding his opinion as to whether a drug trafficking organization would entrust large quantities of drugs to an unknowing courier.

18

B. *The trial court did not abuse its discretion in denying the defense request for access to the jurors' contact information*

Haro contends that the trial court violated her right to due process when it denied her request for postconviction access to identifying juror information. The request was made based on defense counsel's claim that, after the jury returned its verdicts, an unnamed alternate juror told defense counsel that she had overheard other jurors talking about the case prior to deliberations.

1. *Additional background*

The jury returned its verdicts on August 29, 2019. At that time, the trial court sealed the record of the jurors' personal identifying information. Approximately three weeks later, on September 20, 2019, defense counsel moved to obtain access to the jurors' personal identifying information. In the motion, defense counsel recounted that after the verdict was read, she had spoken with some of the jurors in the parking lot. At that time, one of the alternate jurors informed defense counsel that she believed that some of the jurors had discussed the case prior to hearing all of the evidence. According to defense counsel, the alternate juror told defense counsel that she wanted to send a letter for the court to consider in sentencing Haro. Defense counsel provided her e-mail address to the alternate juror. Defense counsel did not name the alternate juror in the petition.

The prosecution opposed defense counsel's petition on the ground that defense counsel had not submitted any juror declarations and was relying solely on hearsay to support her claim.

The trial court heard argument from the attorneys at a hearing on the petition. The court allowed defense counsel to supplement the motion on the date of the hearing with a declaration that stated the following:

19

"1. The day the verdict was returned in the ALICIA HARO trial I spoke briefly to some of the jurors outside the courtroom and then in the parking lot.

"2. In the parking lot one of the alternative [*sic*] jurors expressed her regret that Ms. Haro had been found guilty.

"3. The same juror commented that the jurors had discussed the evidence in the case with each other prior to deliberations.

"4. The juror expressed her concern about the other jurors deciding the outcome of the trial prior to hearing all of the evidence.

"5. She was disturbed by the fact that even though the jury had been admonished to not discuss the evidence and the trial prior to deliberations that they had not followed that rule.

"6. The conversation with this juror was not a long conversation and there were other jurors and also co-counsel in the parking lot where the conversation took place[. *C*]*onsequently I did not have time to follow up with this juror about the extent of the discussions the jurors had about the evidence and about Ms. Haro to see if the juror's conduct rose to the level of misconduct*." (Italics added.)

During the hearing, defense counsel further explained that the alternate juror had told defense counsel that she would write or e-mail defense counsel about the incident, but she had not done so. After the court confirmed that the alternate jurors had not been called for the reading of the verdict, the court declared there was no good cause to grant the petition and denied the request for the jurors' personal information. The matter was thereafter briefly recalled, and defense counsel argued that her "point [was that] this juror was there present when the jury was having discussions about the case before deliberations . . . ." The court indicated that it

20

understood defense counsel's position, but the court nevertheless did not believe the evidence presented demonstrated good cause to grant the petition.

On November 4, 2019, in a motion to continue sentencing, defense counsel signed a second affidavit, attesting to many of the same facts about the alternate juror and indicating that an investigator had been unable to contact the alternate juror as of that date. The trial court moved forward with Haro's sentencing on November 4, 2019.

### 2. *Legal standards*

Code of Civil Procedure section 206 authorizes a defendant to petition for access to personal juror identifying information when that sealed information is "necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g); see *People v. McNally* (2015) 236 Cal.App.4th 1419, 1430.) A petition filed pursuant to Code of Civil Procedure section 206 must be supported by a declaration that includes facts sufficient to establish good cause for the release of the information. (Code Civ. Proc., § 237, subd. (b); see *McNally, supra*, 236 Cal.App.4th at p. 1430.) "Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure." (*McNally, supra*, at p. 1430, citing *People v. Avila* (2006) 38 Cal.4th 491, 604 (*Avila*).)

"Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred . . . .' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345 (*Cook*).) Additionally, the alleged misconduct must be " 'of such a character as is likely to have influenced the verdict improperly.' " (*People v. Jefflo* (1998) 63 Cal.App.4th

21

1314, 1322 (*Jefflo*).) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Cook, supra*, 236 Cal.App.4th at p. 346.) Thus, requests for the release of confidential juror records " 'should not be used as a "fishing expedition" to search for possible misconduct . . . .' " (*Avila, supra*, 38 Cal.4th at p. 604.)

We review a trial court's order denying the request for release of juror information for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317.)

3. *Analysis*

On this record, it is clear that the trial court did not abuse its discretion in denying the defense request to release jurors' personal identifying information. The declaration provided by defense counsel did not identify the alternate juror who purportedly claimed that some jurors had discussed the case prior to deliberations. Defense counsel even conceded in her declaration that counsel "did not have time to follow up with this juror . . . to see if the juror's conduct rose to the level of misconduct," thereby admitting that counsel was unable to make the required showing of good cause—i.e., a showing to support a reasonable belief that jury misconduct actually occurred. (See *Cook, supra*, 236 Cal.App.4th at p. 345.) The declaration does not provide any specificity as to when the discussion that the alternate juror overheard purportedly occurred, how many jurors may have been involved, or what these jurors purportedly said; rather, it indicates only a vague concern on the part of an alternate juror that some of the jurors may have discussed the case and made up their minds prior to deliberations. This vague concern, based on hearsay from an alternate juror who did not participate in the deliberations, is speculative and fails to provide any indication that there was alleged misconduct that was " 'of such a character as is likely to have

22

influenced the verdict improperly' " (*Jefflo, supra*, 63 Cal.App.4th a p. 1322). The showing that defense counsel put forth was thus insufficient to require the court to release the jurors' private information.

Haro argues that the circumstances in *People v. Johnson* (2013) 222 Cal.App.4th 486 (*Johnson*) are "essentially identical" to those in this case and support her contention. We disagree. In *Johnson*, in which the defendant was charged with driving under the influence and causing injury, the defense presented evidence in the form of declarations submitted by the defendant's mother and stepfather, who detailed discussions with three jurors who had indicated to them that some jurors believed that the defendant was "covering" for the real driver. In addition, three jurors told the defendant's stepfather that during deliberations " 'at least half of the jurors . . . raised the question if he is innocent why he didn't take the stand to defend himself.' " (*Id.* at pp. 490–491, 495.) Although the prosecutor conceded that this showing constituted good cause to disclose juror information, the trial court declined to order that the information be disclosed. (*Id.* at p. 491.) The appellate court reversed, explaining that "the mere making of such a statement in the jury room was an overt act of misconduct and admissible as such under Evidence Code section 1150." (*Id.* at p. 495.)

Defense counsel's claims concerning vague hearsay assertions made by an alternate juror to the effect that some jurors may have discussed the case and reached conclusions about the case prior to deliberating is significantly different from the showing in *Johnson* with respect to juror misconduct. Based on what defense counsel provided, we have no sense of what the alternate juror purportedly overheard, and there has been no showing that, even if some jurors discussed the case prior to deliberating, they had

23

prejudged the case. *Johnson* is therefore clearly distinguishable; we reject Haro's reliance on *Johnson* to suggest that the trial court in this case abused its discretion in declining to release the jurors' personal identifying information.

C. *The trial court prejudicially erred in imposing a 20-kilogram enhancement that was not alleged in the charging document*

Haro contends that the trial court erred in imposing a 20-kilogram sentence enhancement because the charging document did not allege such an enhancement with respect to any of the counts charged. Haro argues that she was therefore not on notice that she could be subject to this enhancement.

1. *Additional background*

The jury convicted Haro of one count of conspiracy to transport methamphetamine in noncontiguous counties in count 3 and one count of conspiracy to transport methamphetamine in count 6 (Health & Saf. Code, § 11379, subds. (b), (a); Penal Code, § 182, subd. (a)(1)). The jury found true allegations that each of those counts involved more than 10 kilograms of methamphetamine, and each of those 10-kilogram enhancements was punishable by 10 years in prison. (Health & Saf. Code, § 11370.4, subd. (b)(3)).

On the verdict forms, the jury was asked to determine whether the two conspiracies charged in counts 3 and 6 were part of a single conspiracy or instead, were two separate conspiracies.[6] The jury found that there was a single conspiracy.

---

[6] Because there was evidence to support alternative findings that there were either two separate agreements to commit the charged offenses or a single, broader agreement to commit all of the offenses, the trial court instructed the jury on the issue and asked the jury to determine whether

24

Based on this finding, the trial court determined at sentencing that "count 6 cannot stand on the record, [and] has to be dismissed," explaining that "[y]ou can't be convicted of two conspiracies when there's only one." Although the court dismissed count 6, the court determined that the 10-kilogram enhancement associated with that count would effectively be merged with the 10-kilogram enhancement associated with count 3, such that the enhancement associated with count 3 would become a 20-kilogram enhancement, stating: "I'm not gonna dismiss the allegation, because the allegation of 10 kilos would apply now to count 3, so we now have two 10-kilo allegations for a total of 20, is my point, and that makes it a -- the allegation not being a 10 kilo but now basically a -- instead of 10 years, it's a 15-year sentence for 20 [kilograms]."

The prosecutor stated his agreement with the trial court's analysis. The court continued, "Yeah, . . . the jury found the defendant guilty of both weight enhancements, separate events . . . and so instead of 10 kilos on one conspiracy, it's actually 20 kilos, because there were multiple events of that conspiracy, so that's the way I analyzed it." Defense counsel submitted on the issue without any comment.

2. *Analysis*

As Haro points out, the information alleged, and the jury found true, the 10-kilogram enhancement allegations made under Health and Safety

---

Haro was guilty of a single overarching conspiracy or instead, two separate conspiracies, as charged. (See *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669 ["It is well settled that the essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine[s] the number of the conspiracies." The trial court therefore has a duty to instruct the jury to determine whether defendant engaged in multiple conspiracies or a single conspiracy].)

Code section 11370.4, subdivision *(b)(3)*, each of which carried a 10-year term. However, the trial court imposed a 20-kilogram enhancement term of 15 years under subdivision *(b)(4)* of Health and Safety Code section 11370.4. She argues that "[t]he various enhancements in the subdivisions of Health and Safety Code section 11370.4 are distinct, and the court cannot substitute one of the term enhancements for another." Haro further argues that what the court did is analogous to the trial court's error in *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*) and requires that the enhancement imposed pursuant to Health and Safety Code section 11370.4, subdivision (b)(4) be stricken.

*Mancebo* involved the pleading requirements under the One Strike law, Penal Code section 667.61 (section 667.61), which provides more severe penalties for specified sex offenses that are committed under certain enumerated circumstances. In *Mancebo*, the Supreme Court determined that the trial court erred by imposing a One Strike sentence based on the circumstance that there were multiple victims when no multiple victim circumstance had been pled. (*Mancebo, supra*, 27 Cal.4th at pp. 739–754.) In reaching this conclusion, the Supreme Court "relied primarily on the plain language of section 667.61." (*People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*), citing *Mancebo, supra*, at p. 743.) At the time *Mancebo* was decided, section 667.61, subdivision (i) provided: " 'For the penalties provided in this section to apply, the existence of any fact required under subdivision (d) or (e) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact.' " (*Mancebo*, at p. 741, fn. 4, quoting § 667.61, former subd. (i), as amended by Stats. 1997, ch. 817, § 6, p. 5577.) In addition, section 667.61, subdivision (f) provided that the " 'circumstances . . . required for the punishment' " under

the One Strike law had to be " 'pled and proved.' " (*Mancebo*, at p. 741, fn. 4, quoting § 667.61, former subd. (f).) Although the facts that would establish the multiple victim circumstance (i.e., that the defendant's crimes involved multiple victims) were evident from the information, what was missing from the information was anything indicating that the prosecution would seek to *use* the multiple victim circumstance as a basis for imposing a One Strike sentence. The absence of any indication that the prosecution intended to use the multiple victim circumstance to support One Strike sentencing violated "the explicit pleading provisions of the One Strike law," as well as the due process principles underlying those provisions. (*Mancebo*, at p. 743.) Because the prosecution has the power to make discretionary charging decisions, the information was reasonably read to indicate that the prosecution had chosen to exercise its discretion in *not* charging a multiple victim circumstance. (*Id.* at p. 749.) The information thus failed to provide the defendant with fair notice that the prosecution would ultimately seek to rely on the multiple victim circumstance to increase his punishment. (*Id.* at p. 753.)

More recently, the Supreme Court applied similar reasoning in *Anderson, supra*, 9 Cal.5th 946. In *Anderson*, the Supreme Court held that an information that alleged only a single 25-years-to-life vicarious firearm enhancement under section 12022.53, subdivision (e) with respect to a murder count did not provide adequate notice to the defendant that the prosecution would seek the same enhancement with respect to five robbery counts as to which the enhancement had not been pled. (*Anderson, supra*, at p. 950.)

In *Anderson*, the trial court instructed the jury that it could find that the prosecution proved the elements of the 25-years-to-life vicarious firearm

discharge enhancements under section 12022.53, subdivision (e) as to the robbery counts, even though those enhancements were not alleged with respect to the robbery counts in the operative charging document. The court also approved verdict forms to the same effect.[7] (*Anderson, supra*, 9 Cal.5th at p. 951.) The jury convicted the defendant on all 10 counts with which he had been charged, and also returned true findings on all of the enhancement allegations contained in the verdict forms. (*Ibid.*) At sentencing, after initially asking the court to impose the less severe 10-year personal firearm-use enhancements and to " '[i]mpose and stay' " the 25-years-to-life vicarious firearm discharge enhancements as to the robbery counts, the People ultimately asked the court to impose the 25-years-to-life enhancements as to the robbery counts. (*Id.* at pp. 951–952.) The trial court did so, sentencing Anderson to a total of 189 years to life, including a total of 125 years to life for the enhancements corresponding to the five robbery counts. (*Id.* at p. 952.)

The *Anderson* court considered whether "the accusatory pleading . . . gave Anderson adequate notice of the allegations that were ultimately invoked to add at least 125 years to his sentence." (*Anderson, supra*, 9 Cal.5th at p. 953.) In concluding that it had not, the *Anderson* court reviewed *Mancebo*, and explained that although "*Mancebo*'s holding was limited to the pleading requirements of section 667.1, subdivisions (f) and (i)," the reasoning of *Mancebo* was "not so limited." (*Id.* at p. 954.) The

---

[7] The record did not disclose how the trial court's instruction and approval of the verdict forms came about. (*Anderson, supra*, 9 Cal.5th at p. 951.) The operative charging document had alleged less severe 10-year personal firearm-use enhancements under Penal Code section 12022.53, subdivision (b) and three-, four-, or 10-year enhancements under Penal Code section 12022.5, subdivision (a) with respect to the five robbery-related counts. (*Anderson, supra*, at p. 951.)

requirement included in section 1170.1, subdivision (e) that sentence enhancements " 'shall be alleged in the accusatory pleading,' " as discussed in *Mancebo*, mirrored the requirement in the firearm enhancement statute itself (§ 12022.53, subd. (j)), as well as the requirement in section 12022.53, subdivision (e) that the prosecution "ple[a]d and prove[ ]" the allegations underlying the vicarious firearm enhancements. (*Anderson, supra*, at p. 953.) "Beneath all three statutory pleading requirements lies a bedrock principle of due process," which is that " ' "[a] criminal defendant must be given fair notice of the charges against him in order that he may have a reasonable opportunity properly to prepare a defense and avoid unfair surprise at trial." ' [Citation.] This goes for sentence enhancements as well as substantive offenses: A defendant has the 'right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes.' [Citation.]" (*Ibid.*)

Thus, the "statutory pleading requirements . . . , read against the backdrop of due process, require more than simply alleging the facts supporting an enhancement somewhere in the information." (*Anderson, supra*, 9 Cal.5th at p. 956.) "A pleading that alleges an enhancement as to one count does not provide fair notice that the same enhancement might be imposed as to a different count. When a pleading alleges an enhancement in connection with one count but not another, the defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the second count, and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial." (*Ibid.*) The court held that "[f]air notice requires that every sentence enhancement be pleaded in connection with every count as to which it is imposed." (*Anderson, supra*, at pp. 956–957.)

29

Applying the reasoning of *Mancebo* and *Anderson* to this case, we conclude that Haro was not provided fair notice that she could be subject to a 20-kilogram sentence enhancement (Health & Saf. Code, § 11370.4, subd. (a)(4)) in connection with count 3. Like the statutes at issue in *Mancebo* and *Anderson*, the enhancement scheme at issue in this case requires that the prosecution plead and prove the weight of the substance before the court may impose any specific weight enhancement: "The additional terms provided in this section shall not be imposed unless the allegation that the weight of the substance containing heroin, cocaine base as specified in paragraph (1) of subdivision (f) of Section 11054, cocaine as specified in paragraph (6) of subdivision (b) of Section 11055, methamphetamine, amphetamine, or phencyclidine (PCP) and its analogs exceeds the amounts provided in this section is charged in the accusatory pleading and admitted or found to be true by the trier of fact." (Health & Saf. Code, § 11370.4, subd. (c).) Even though the accusatory pleading includes the allegation of facts from which, if found true, one could conclude that more than 20 kilograms of methamphetamine were at issue in the offenses for which Haro was charged, the pleading itself did not provide Haro with fair notice that the People intended to exercise their discretion to pursue a sentencing enhancement based on a conspiracy to transport more than 20 kilograms of methamphetamine. To the extent that the People did not allege a 20-kilogram enhancement with respect to any of the counts, the operative charging document failed to comply with the relevant statutory pleading requirements that would have permitted the trial court to impose a 20-kilogram enhancement term in connection with any particular count. The trial court therefore erred in aggregating the weights alleged in the two 10-

kilogram enhancements charged in counts 3 and 6 and imposing sentence for a 20-kilogram enhancement with respect to count 3.

The People suggest that we may uphold the trial court's sentence on the ground that Haro failed to object when the trial court indicated its intention to impose the 20-kilogram enhancement. As a general rule, a defendant who fails to object in the trial court to a purportedly erroneous ruling forfeits the right to challenge that ruling on appeal. (*People v. Smith* (2001) 24 Cal.4th 849, 852.) Haro argues that the trial court's error resulted in an unauthorized sentence, such that normal forfeiture rules do not apply. However, the *Anderson* court made clear that "impos[ition of] unpleaded sentence enhancements is an error of a different variety" from the imposition of an unauthorized sentence. (See *Anderson, supra*, 9 Cal.5th at p. 962.) Therefore, this error is one that may be forfeited. However, as the *Anderson* court further concluded, a reviewing court nevertheless possesses "the power to reach the merits of [a defendant's] claim" where the court has imposed an unpleaded sentence enhancement, "notwithstanding [the defendant's] failure to object below." (*Id.* at pp. 962–963.) The *Anderson* court determined that it would address the error despite the lack of a timely objection, for three main reasons: (1) the error was "clear and obvious," (2) the error affected the defendant's "substantial rights by depriving [him] of timely notice of the potential sentence he faced," and (3) "the error was one that goes to the overall fairness of the proceeding." (*Id.* at p. 963.) In our view, these same reasons weigh in favor of addressing Haro's contention in this case. In particular, the sentencing error affected Haro's substantial rights by depriving her of timely notice that she could be subject to a 20-kilogram weight enhancement (which carries a 15-year term) rather than the 10-kilogram weight enhancement (which carries a 10-year term) that was

31

charged with respect to both of the conspiracy charges alleged, if she were to be convicted of only a single conspiracy. This failure of notice therefore also undermined the fairness of the proceeding.

Finally, we address the People's contention that the pleading issue and resulting sentencing error was harmless on the ground that Haro "had notice and a chance to prepare a defense on the weight enhancement" because "two 10-kilogram weight enhancements were properly pled and proved." We disagree with this contention. The record does not support the conclusion that Haro had adequate notice of the court's intention to impose a 20-kilogram enhancement with respect to the remaining conspiracy count. In *Anderson*, the trial court had instructed the jury on the 25-years-to-life enhancements and the verdict form asked the jury to make factual findings on those enhancements, notwithstanding the fact that these enhancements were not pled in the charging document. (*Anderson, supra*, 9 Cal.5th at pp. 963–964.) In this case, there was no verdict form nor an instruction to the jury that asked the jury to decide whether the conspiracy involved 20 kilograms of methamphetamine, and there was no indication at any point prior to the sentencing hearing that the court would impose a 20-kilogram enhancement. It was only at the last minute, when the trial court decided to aggregate the enhancement that was pled and found true with respect to count 3 with the enhancement that was pled and found true with respect to count 6 (which was dismissed as a result of the jury's finding that there was a single conspiracy), that Haro was apprised of the possibility that she would be subject to a 20-kilogram enhancement. This was insufficient to allow Haro the opportunity to decide how to approach her defense strategy. As the *Anderson* court explained, "[T]he purpose of a statutory pleading requirement is not simply to ensure the defendant has notice of the potential sentence on

the day of sentencing.  It is meant to give sufficient notice to permit the defense to make informed decisions about the case, including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial." (*Anderson, supra*, at p. 964, citing *Mancebo, supra*, 27 Cal.4th at p. 752.)

We disagree with the People's contention that the fact that two separate 10-kilogram enhancements were charged and found true was sufficient to put Haro on notice that she could be subject to a 20-kilogram enhancement upon the dismissal of one of the counts to which one of the 10-kilogram enhancements was connected.  The People rely on *People v. Estrada* (1995) 39 Cal.App.4th 1235 (*Estrada*) to support their contention that the trial court could "aggregate[ ] two enhancements that had been properly pled and proved after the jury concluded the two instances were part of one single conspiracy."  In *Estrada*, the defendants were arrested transporting 29 kilograms of cocaine.  A subsequent search of their home revealed an additional 38 kilograms of cocaine.  (*Id*. at p. 1237.)  The defendants were convicted of possession for sale of cocaine, transportation of cocaine, and conspiracy to transport cocaine.  (*Ibid*.)  The trial court "added a 20-year enhancement to the possession for sale count [based on a 40-kilogram enhancement], and a 15-year enhancement to the transportation count [based on a 20-kilogram enhancement], to run concurrently."  (*Id*. at p. 1238.)  On appeal, the defendants argued that the court "improperly allowed the same cocaine to be used both for a quantity enhancement as to the transportation count and a separate quantity enhancement as to the possession for sale count."  (*Ibid*.)  The *Estrada* court concluded that the trial court could impose the 40-kilogram enhancement, given that the "the focus [of the drug weight enhancements in Health and Safety Code section 11370.4]

33

is on the total amount of the drugs possessed by the defendant." (*Id.* at p. 1240.) However, the *Estrada* court further concluded that once the trial court had aggregated the two amounts to impose the 40-kilogram enhancement with respect to the possession count, it was error for the court to impose an additional 20-kilogram enhancement with respect to the transportation count, because those drugs had been accounted for in the 40-kilogram enhancement. (*Ibid.*)

Importantly, there is no indication in *Estrada* as to how these enhancements were charged in the operative charging document, and the defendants did not raise a challenge based on the failure of the charging document to provide notice that they could be subject to a 40-kilogram enhancement. Thus, *Estrada* does not provide us with reason to deviate from the reasoning set out in *Mancebo* and *Anderson* with respect to the challenge that Haro raises. Further, to the extent that the trial court in *Estrada* may have imposed a 40-kilogram enhancement where none was pled, we are not convinced that such a result would be consistent with the Supreme Court's more recent analysis of similar issues in *Mancebo* and *Anderson*.[8]

Further, although the People suggest that Haro's "exposure from the two ten-kilogram enhancements, and underlying offenses, was 21 years

---

[8]    As Haro argues, it is possible that the charging document in *Estrada* did allege multiple alternative enhancement allegations, given that the *Estrada* court mentioned in a footnote that "[n]othing precludes prosecutors from charging multiple enhancements, since the defendant might not be convicted of the charge carrying the greatest enhancement." (*Estrada, supra*, 39 Cal.App.4th at p. 1240, fn. 8.) However, the court's reference to the fact that a defendant "might not be convicted of the *charge* carrying the greatest enhancement" (italics added) suggests that the court may not have been discussing the possibility of multiple alternative enhancements being alleged with respect to one specific offense.

4 months,"[9] and that because the punishment she received for the single 20-kilogram weight enhancement and substantive offense was 21 years, having had notice of the 20-kilogram weight enhancement would "not have impacted her decision to go to trial." The People's comparison is not well-taken. The question is whether Haro had notice of what her exposure would be under the People's discretionary pleading choices if she were convicted of only a single conspiracy—not what her exposure would have been if convicted of two separate conspiracies. Based on the People's pleading decision, Haro was on notice that if the jury found a single conspiracy, even though two were charged, she would face only a 10-kilogram weight enhancement. The People could have put Haro on notice that if her conduct were determined to be part of a single conspiracy, she could be subject to a 20-kilogram weight enhancement, if they had alleged an overarching conspiracy with respect to Haro's conduct on both dates and alleged that 20 kilograms of methamphetamine was involved. However, they did not do so.

We therefore conclude that the trial court's imposition of a 15-year term for the 20-kilogram enhancement that was neither pled nor proven must be stricken. Reversal of the judgment and a limited remand for resentencing is necessary. On remand, the court may impose only a 10-year term pursuant to the 10-kilogram enhancement pled in association with count 3. However, on remand the court may resentence Haro as to all counts, because "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial

---

[9] It is unclear how the People reached this number; our calculations place the potential exposure at 23 years 4 months if Haro had been found guilty on all counts and the jury had determined that there had been two separate conspiracies. However, this difference is immaterial for purposes of our discussion.

35

court can exercise its sentencing discretion in light of the changed circumstances.'" (*People v. Buycks* (2018) 5 Cal.5th 857, 893; see *People v. Castaneda* (1999) 75 Cal.App.4th 611, 614 (*Castaneda*).) In doing so, the court may not exceed the aggregate prison term originally imposed. (See *Castaneda, supra*, 75 Ca1.App.4th at p. 614.)

D.  *Haro's contention that the trial court erred by failing to appreciate that it had discretion to impose a split sentence*

Because we have concluded that the judgment must be reversed and that Haro's sentence must be vacated and the matter remanded for resentencing, we need not address Haro's final contention on appeal regarding the trial court's decision not to impose a split sentence.[10] We simply note that if the trial court again decides on remand that a split sentence would not be an appropriate sentence in this case, the trial court may avoid potential error by stating that it is exercising its discretion in declining to impose a split sentence for the reasons described in *People v. Arce* (2017) 11 Cal.App.5th 613, in which the appellate court held that trial court did not abuse its discretion in concluding that a split sentence is not appropriate where a defendant "is subject to both mandatory deportation and mandatory detention pending his removal," given that mandatory supervision would not be possible "as a practical matter" when a defendant is no longer in the United States.

---

[10]  "[U]nder a so-called 'split' sentence [ ] a part of the sentence is served in county jail and a part of the sentence is served under the supervision of the county probation officer. ([Pen. Code, ]§§ 17.5, subd. (a)(5), 1170(h)(1)-(3), (5), (6).)" (*People v. Kelly* (2013) 215 Cal.App.4th 297, 301.)

IV.

DISPOSITION

The Health and Safety Code section 11370.4, subdivision (b)(4) enhancement term is stricken, Haro's sentence is vacated and the matter is remanded for resentencing consistent with the discussion in this opinion.  In all other respects the judgment is affirmed.


AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DATO, J.