Filed 6/28/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068255 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS276082) |
| SERGIO IGNACIO ROMO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Dwayne K. Moring, Judge. Affirmed with directions.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Sergio Ignacio Romo was charged by amended

information with unlawfully importing controlled substances (i.e., heroin) into California from Mexico (Health & Saf. Code, § 11352, subd. (a); count 1) unlawfully possessing controlled substances (i.e., heroin) for sale (Health & Saf. Code, § 11351; count 2); unlawfully importing controlled substances (i.e., methamphetamine) into California from Mexico (Health & Saf. Code, § 11379, subd. (a); count 3); and unlawfully possessing controlled substances (i.e., methamphetamine) for sale (Health & Saf. Code, § 11378; count 4). The amended information further charged in counts 1 and 2 that the heroin weighed more than one kilogram (Heath & Saf. Code, § 11370.4, subd. (a)(1)) and in counts 3 and 4 that the methamphetamine weighed more than four kilograms (Health & Saf. Code, § 11370.4, subd. (b)(2)). A jury returned guilty verdicts on all four counts and on the enhancements. The court sentenced defendant to the term of seven years, based on the low term of two years on count 3 and the five-year weight enhancement under Health and Safety Code section 11370.4, subdivision (b)(2) alleged in connection with count 3. The court either stayed the remaining counts/enhancements or determined they ran concurrent to count 3.

Defendant contends on appeal that the prosecutor committed misconduct during closing argument when the prosecutor allegedly improperly reversed the presumption of innocence; that the court prejudicially erred when it admitted hearsay evidence; that the People's experts should not have been allowed to opine that defendant was not a "blind mule" (i.e., was unaware of the drugs in his car) when he crossed into the United States from Mexico; and that defendant was entitled to seven additional days of presentence

2

credits.

As we explain, we agree defendant was entitled to seven additional days of presentence credit. In all other respects, we affirm the judgment of conviction.

FACTUAL BACKGROUND

A. *Prosecution Case*

Customs and Border Protection Officer Jorge Castilla testified he was working as a primary inspector at a booth at the Otay Mesa Port of Entry on the morning of November 22, 2014, checking vehicles coming into the United States from Mexico. Officer Castilla contacted defendant, who was alone. Defendant was driving a silver Ford Fiesta with Mexican plates "ALB56-08." After contacting defendant for about two minutes, during which time defendant handed Officer Castilla a border crossing card and twice stated he had nothing to declare, Officer Castilla directed defendant to secondary inspection.

Customs and Border Canine Enforcement Officer Steve Andaluz testified he and his German Shepard, Zacky, contacted defendant's car in secondary. As Officer Andaluz walked Zacky around the car, Zacky "alerted to the passenger side rear door on the rear rocker panel." Officer Andaluz testified a rocker panel is the part "right underneath the door where the door closes."

Customs and Border Protection Officer Katheryn Gomez testified she next searched defendant's car. On inspection, Officer Gomez found a "black sticky substance covering a hole that looked like it had been cut out" on the inside of both the driver and

3

passenger side rocker panels. After completing her general inspection of the car, Officer Gomez removed the driver and passenger seats to access the rocker panel area. Officer Gomez then used a crowbar to expose an opening she estimated was about six to eight inches wide and about three inches high.

Officer Gomez testified she found 10 "packages" inside the driver side rocker panel and nine "packages" inside the passenger side rocker panel. She estimated it took her about three or four hours to remove all the packages from the car because the packages were each attached to a "string" that could be easily broken if it was pulled too hard. After conducting a "presumptive test," Officer Gomez found 16 of the packages contained methamphetamine and the remaining three contained heroin. The parties stipulated that the heroin found in defendant's car had a net weight of 2.961 kilograms, or 6.52 pounds, and the methamphetamine had a net weight of 8.457 kilograms, or 18.64 pounds.

Department of Homeland Security Special Agent Jeffrey Richardson testified he interviewed defendant shortly after his arrest. Defendant denied any knowledge of the drugs found in his car, thus making him a so-called "blind mule." Agent Richardson testified the term "blind mule" referred to a person who drives across the border without knowing he or she is smuggling drugs. As a result of the amount and value of the drugs found in the car and their location, Agent Richardson opined defendant was not a blind mule.

Agent Richardson testified defendant "look[ed] up at the ceiling and then roll[ed]

4

his eyes to the back of his head" when questioned about whether he knew there were drugs in the car. Based on Agent Richardson's training, he opined defendant's mannerisms in response to these (and other) questions were consistent with those of an untruthful person. In Agent Richardson's experience, when drugs are found in a person's car it is not uncommon for that person to deny knowledge of their presence.

During the interview, defendant told Agent Richardson that he had owned the car for about three months. Inside the car, Agent Richardson found a Mexican vehicle registration card showing defendant had registered the car in Mexico about a month earlier.

Agent Richardson testified it was not uncommon for a person to smuggle drugs across the border in his or her own car; that typically a smuggler uses a car he or she has owned for only a short period of time; and that a smuggler also usually registers the car in his or her own name because "generally, the person might not have a criminal history," "it makes it easier for them if they don't have any past smuggling attempts," and, if they register in their own name, it is "generally easier for them to cross the border."

During the interview, defendant stated that he also owned a truck, but that it had been stolen in Mexico four days earlier; that he alone drove the Ford Fiesta; that he had driven the Ford Fiesta from Mexico into the United States three times prior to his arrest on November 22, which Agent Richardson confirmed after running a records check; that he used the Otay Mesa Port of Entry each time he crossed in the Fiesta into the United States; and that his purpose in coming into the United States that day was to buy a bicycle

5

and a tablet for his niece. According to Agent Richardson, defendant's car had not been searched on the three previous occasions defendant had driven it across the border.

Defendant informed Agent Richardson that, eight days before his arrest, defendant had taken the Fiesta to a mechanic in Mexico for brake service. When asked about his occupation in Mexico, defendant stated he was a retired gas station attendant who made about 2,400 pesos a month. Agent Richardson testified that 2,400 pesos a month was about $160.

Agent Richardson opined that a "usable quantity of heroin" was about 0.05 grams; that when heroin is sold "on the streets," it typically is sold in a quantity of a "tenth of a gram"; and that a tenth of a gram typically costs between $50 and $60. Based on these estimates and valuations, Agent Richardson further opined the heroin found in defendant's car had a "street value" of about $1.6 million. Using a similar analysis, Agent Richardson estimated the "street value" of the methamphetamine found in defendant's car was about $660,000.

Given the amount of drugs in defendant's car, Agent Richardson opined the drugs were possessed for sale and not for use. Agent Richardson further opined that first-time smugglers typically do not carry the amount of drugs found in defendant's car because "[i]t's high-risk. It's a lot of money for the drug organization to -- to potentially lose for a first-time smuggler. [¶] Generally, they start them out with marijuana. They're willing to lose a little bit of marijuana compared to losing $2 million's [*sic*] worth of heroin and meth." According to Agent Richardson, usually a person has to smuggle successfully up

6

to 10 times before a person is trusted with the amount of drugs found in defendant's car.

Department of Homeland Security Special Agent Wesley Petonak testified that in his experience, the "overwhelming majority" of people trafficking drugs across the border do so knowingly for financial gain. Agent Petonak stated since 2011, he has worked on a task force with about 10 others to handle blind mule cases, which he described as cases involving people who unwittingly smuggle drugs across the border. During this four-year period, Agent Petonak personally investigated about 28 of such cases and he was aware of about 10 others during this same time period. Given that there are thousands of border drug busts every year, Agent Petonak opined the percentage of blind mule cases is "very low," or one percent or less of the total drug busts.

Agent Petonak discussed a "typical" blind mule case: often blind mules are United States citizens because "they are subject to less scrutiny on an immigration inspection coming across the border. [¶] California-plated vehicles. [*Sic*.] Because a California plate is under less scrutiny coming across the border than perhaps a Baja plate or an out-of-state plate. [¶] And then also the overwhelming majority -- I'd say more than 99 percent -- have been vehicles in the SENTRI program, which is the Secured Electronic Network for Travelers Rapid Inspection. S-E-N-T-R-I. [¶] Which, if you're unfamiliar with the program, it allows people that are trusted travelers to come through with less inspections."

In response to why people in the SENTRI program are targeted as "mules," Agent Petonak stated that the wait time in the SENTRI lanes is about five to 10 minutes,

7

whereas, on some days, the general border wait can be up to four hours; that people in SENTRI tend to cross the border frequently and in a set or predictable pattern, such as for work; and that typically, drug trafficking organizations attached magnets to packages of drugs and place the packages underneath cars.

If the team concludes a person was in fact a blind mule, Agent Petonak stated they will ask the person's permission to follow his or her car to his or her place of business in what he termed was a "controlled delivery" to catch those responsible for placing the drugs in the car. Agent Petonak noted once the car with the drugs is parked, typically two younger males, usually in their 20's, will arrive to pick up the drugs and be arrested.

Agent Petonak testified he has never had a blind mule case where the drugs were "embedded" into the car, such as in the instant case. Instead, in every blind mule case he has worked on, the drugs were placed in a location where they could be removed quickly, usually within a matter of seconds. According to Agent Petonak, the drug involved in the "overwhelming majority" of blind mule cases is marijuana, because using a blind mule rather than a "paid mule" is risker and marijuana is less expensive on the street than drugs such as methamphetamine, heroin or cocaine. However, in some instances when the drug being transported involves "hard narcotics," Agent Petonak testified the drug trafficking organization will also attach a GPS tracking device in order to keep "tabs" on the location of the drugs.

Agent Petonak opined that defendant was not a blind mule. Agent Petonak reached this conclusion based on where the drugs were found in defendant's car; the fact

8

there were two compartments in the car to hide the drugs, which he believed would have taken up to a day or more to make; and the amount of time it would have taken to place the drugs inside each compartment. According to Agent Petonak, the fact that the seats had to be removed to access the drugs also suggested defendant was not a blind mule.

Other factors considered by Agent Petonak in concluding defendant was not a blind mule included: defendant had crossed the border only a few times in his Fiesta; defendant was not a member of SENTRI; defendant was a Mexican citizen with a visa; and defendant's car had Mexican license plates. Finally, the quantity and type of drugs found in the car further supported Agent Petonak's opinion that defendant was not unaware of the presence of the drugs. At a minimum, with the quantity of drugs involved, Agent Petonak would have expected the drug trafficking organization to use a GPS tracking device if defendant was truly a blind mule.

B. *Defense Case*

Testifying in his own defense, defendant stated that he purchased the Fiesta with severance pay about three months before his arrest; that he bought the car for 25,000 pesos, or for about $1,800, from a "gentleman that sells cars on the street" near where he lived; that he registered the car about a month before he was arrested; that about eight days before his arrest, he took the car to a place called "Juniors" to have the brakes fixed and the oil changed; that his car was at "Juniors" for about three hours; that he went home while the mechanic worked on his car; that he told the mechanic he traveled to the United States and wanted the car checked to ensure it was in "good condition"; that he never told

9

anyone else, including his brother, of his purchase of the car; and that he parked the car with his "lover," whom he knew only a very short time.

On the day he was arrested, defendant testified that he went across the border to buy a tablet and a bicycle for his niece; that he noticed that day one of the door handles on the car was broken; and that he did *not* know there was drugs in the car, which is what he also told agents when he was interviewed postarrest.

Defense expert Professor Victor Clark Alfaro testified extensively regarding drug trafficking from Mexico to the United States, including about the organizations and structure of such organizations primarily responsible for most of that activity; and the tactics and techniques the drug traffickers use to transport the drugs across the border.

Professor Alfaro testified that he first began to hear the term blind mule in about 2005 and that it refers to "an individual who cross[es] the border through -- as a pedestrian or in a vehicle, without knowing that he's carrying or she's carrying drugs." Professor Alfaro gave an example of a "regular customer" going to a "machine shop" in Tijuana that belongs to drug traffickers who then load up the car with drugs without the customer knowing. He also noted drug traffickers sometimes use magnets to put drugs under cars that pass through SENTRI lanes at the border. According to Professor Alfaro, typically the drugs transported by "blind mules" are marijuana, methamphetamine and heroin.

Professor Alfaro opined that drug traffickers use "blind mules" because it is the "cheapest way to cross drugs to the US side. Because you are not paying . . . the blind

10

mule. It's . . . cheap labor, [a] disposable [work]force. You're not investing [in] [any]thing." Although all drug traffickers use "blind mules," Professor Alfaro opined that 70 percent of the "ones who use blind mules are smaller organizations."

Professor Alfaro noted there are thousands of "irregular vehicles" in Tijuana that come from the United States without "regular plates." According to Professor Alfaro, there have been instances when some of these cars come into Mexico with drugs already inside of them, which he referred to as a "blind mule by accident." He testified that after a blind mule crosses the border, the drug traffickers will monitor the vehicle, including by GPS, and that once the vehicle is parked, they remove the drugs or just steal the car.

On cross-examination, Professor Alfaro confirmed that when he was hired by the defense, he was specifically asked to review the file and determine whether he could "testify that this was a blind mule case." Professor Alfaro also testified it was "easy" and "lucrative" but "very risky" to become a mule in Mexico to bring drugs across the border.

Professor Alfaro admitted on cross-examination that the risk to drug traffickers using a paid mule was significantly less than using a blind mule; that when he reviewed this case, he initially told defense counsel that the "quantity of drugs of your client exceeds what a blind mule usually has"; that drug traffickers are "far more likely to use a blind mule for a marijuana case as opposed to a hard narcotics case"; and that when drug traffickers use "blind mules," they specifically target people "that aren't going to trigger any alarms at the border," such as people who "cross all the time."

I

11

Prosecutorial Misconduct

A. *Brief Additional Background*

During closing argument, the prosecutor in rebuttal made the following statements: "As the evidence comes in -- and the evidence has come in -- and *when you walk into that jury room and discuss the case -- discuss the evidence in this case, once the evidence proved to you beyond a reasonable doubt that [defendant] committed the crime*, there's no presumption of innocence. It's -- it goes away as the evidence comes in and the evidence shows you that he's guilty. The presumption of innocence doesn't just stay there forever. [¶] The evidence proves to you that he's committed the crime and is guilty beyond a reasonable doubt." (Italics added.)

The record shows the court instructed the jury as follows with CALCRIM No. 103, which explains reasonable doubt and the presumption of innocence:

"I will now explain the presumption of innocence and the People's burden of proof. The defendant has pleaded not guilty to the charges. The fact that a criminal charge has been filed against the defendant[] is not evidence that the charge is true. You must not be biased against the defendant[] just because [he] has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that

12

the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant[] guilty beyond a reasonable doubt, [he] is entitled to an acquittal and you must find [him] not guilty."

B. *Guiding Principles and Analysis*

The case of *People v. Goldberg* (1984) 161 Cal.App.3d 170 (*Goldberg*), which defendant neglected to cite either in his opening brief or—even after discussed at length by the People in its respondent's brief—in his reply brief, informs our decision.[1] There, the prosecutor declared during closing argument: " 'And before this trial started, you were told there is a presumption of innocence, and that is true, but once the evidence is complete, once you've heard this case, once the case has been proven to you—and that's the stage we're at now—the case has been proved to you beyond any reasonable doubt. I mean, it's overwhelming. *There is no more presumption of innocence.* Defendant Goldberg has been proven guilty by the evidence. Thank you.' " (*Id.* at p. 189.) In concluding these statements were not misconduct, the *Goldberg* court found the

1    For future reference, we strongly encourage appellate counsel to review the rules governing an attorney's ethical obligations to advise a tribunal of *all* legal authority relevant to an issue, as opposed to authority that merely supports a client's position on that issue. (See, e.g., *In re Reno* (2012) 55 Cal.4th 428, 510 [noting "[a]ttorneys are officers of the court and have an ethical obligation to advise the court of legal authority that is directly contrary to a claim being pressed," citing among other authority Rule 5–200 of the California Rules of Professional Conduct].)

prosecutor was merely restating, "albeit in a rhetorical manner," the otherwise noncontroversial point that a defendant is presumed innocent " 'until the contrary is proved.' " (*Ibid.*)

Our high court in *People v. Booker* (2011) 51 Cal.4th 141 (*Booker*)—which again defendant neglected to cite—also guides our decision on this issue. There, the prosecutor made the following statements to the jury during the guilt phase of closing argument: " 'I had the burden of proof when this trial started to prove the defendant guilty beyond a reasonable doubt, and that is still my burden. It's all on the prosecution. I'm the prosecutor. That's my job. [¶] The defendant was presumed innocent until the contrary was shown. That presumption *should have left many days ago.* He doesn't stay presumed innocent.' " (*Id.* at p. 183, italics added.)

In rejecting the argument the above-italicized statement was prosecutorial misconduct, our high court approvingly cited *Goldberg* when it concluded as follows: " 'Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they,* as the fact-finding body, conclude guilt was proven beyond a reasonable doubt.' (*Goldberg*, *supra*, 161 Cal.App.3d at pp. 189–190, original italics.) We agree. Although we do not condone statements that appear to shift the burden of proof onto a defendant (as a defendant is entitled to the presumption of innocence until the contrary is found by the jury), the prosecutor here simply argued the jury should return a verdict in his favor based on the state of the evidence presented." (*Booker*,

14

*supra*, 51 Cal.4th at p. 185.)

While unable to cite to legal authority (ostensibly) against his position, including authority from our high court, defendant was able to cite to the case of *People v. Dowdell* (2014) 227 Cal.App.4th 1388 (*Dowdell*), which (ostensibly) supports his position.  There, during closing argument, the prosecutor twice stated without objection that the " 'presumption of innocence is over' " *and* that the defendant " 'has gotten his fair trial.' " (*Id.* at p. 1407.)

The defendant in *Dowdell* argued defense counsel was deficient for failing to object to these statements.  The *Dowdell* court agreed, noting the presumption of evidence continues not only through the presentation of evidence, but also during deliberations and until a verdict is reached.  (*Dowdell*, *supra*, 227 Cal.App.4th at p. 1406.)  The *Dowdell* court found *Goldberg* distinguishable because the prosecutor in the case before it had twice made what the court considered to be a clear misstatement of the law regarding the presumption and because the prosecutor also stated the defendant had gotten a "fair trial," which "implied that the 'fair trial' was over, and with it, the jury's legal obligation to respect the presumption of innocence."  (*Dowdell*, at p. 1408.)  Thus, the *Dowdell* court concluded defense counsel should have objected, and, if such an objection had been made, the court would have sustained that objection and instructed the jury that the presumption "remained in effect."  (*Ibid.*)  However, because the defendant could not show prejudice, the court in *Dowdell* held defense counsel was not ineffective. (*Id.* at pp. 1408-1409.)

Here, the prosecutor's statements are far more innocuous than the ones that withstood scrutiny in *Goldberg* and *Booker*, and they also are distinguishable from those in *Dowdell*, where the prosecutor misstated the law in arguing the presumption was reversed *after* defendant had gotten a " 'fair trial.' " (See *Dowdell*, *supra*, 227 Cal.App.4th at p. 1408.)

Indeed, the statements by the prosecutor in *Goldberg* suggested the presumption of innocence was lost when the trial was over, but before deliberations commenced; and in *Booker*, the statements suggested that presumption was lost *in the middle of trial*, based on the weight of the evidence. In contrast, the statements by the prosecutor in the instant case suggested the presumption of innocence would be gone only *after* the jury *began* deliberations in the jury room *and* considered the evidence of guilt.

We thus conclude the prosecutor's argument in the instant case was not an incorrect statement of the law and was, in any event, merely a rhetorical statement about the weight of the evidence of guilt. However, like courts before us (see *Booker*, *supra*, 51 Cal.4th at p. 185), we do not condone any statements that even remotely imply the presumption of innocence is lost before the jury returns a verdict.[2]

---

[2] In light of our decision on this issue, we deem it unnecessary to address the People's alternate contention—which appears to have merit—that defendant forfeited his claim of alleged prosecutorial misconduct by his counsel's failure to object to the offending statements. (See *People v. Panah* (2005) 35 Cal.4th 395, 462 [noting to " 'preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his [or her] objection, and ask the trial court to admonish the jury' "].)

II

Evidentiary Issues

A. *Hearsay*

Defendant contends the court prejudicially erred when it ruled to admit testimony from Agent Richardson that he performed a record search on the Internet that established the make and model of defendant's Fiesta was never sold as a new car in the United States.

    1. <u>Brief Additional Background</u>

Professor Alfaro testified he had two "hypotheses" regarding how the drugs got into defendant's car without defendant's knowledge: "One -- [this] is the strongest hypothesis, a main one -- is that Mr. Romo bought a car, a secondhand car, a Fiesta Ford, 2004. It's an old car in Tijuana. [¶] I don't know how much he paid for it. It is not too much money. [¶] . . . [¶] And he went to a mechanic shop to repair the brakes. [¶] After that he cross twice the border. [¶] And the third time he cross, the car was loaded with drugs. [¶] My hypothesis is that this man bought a secondhand car that was import[ed] from the US side, loaded with drugs.

"The other hypothesis -- and it is [a] very weak hypothesis -- is that when he went to the mechanic shop to repair the brakes of his car, the mechanics load[ed] the car with drugs. [¶] But it's a weak hypothesis because, after that process, he cross twice the border. [¶] And doesn't sound -- it's a weaker hypothesis because, if those mechanic shops were part of a drug trafficking ring, then they will follow the car the first time he

17

cross.  [¶]  But he cross twice, thinking that he was already carrying drugs, thinking that he bought a car import[ed] from US loaded with drugs."

In rebuttal, Agent Richardson was asked whether the "exact model" of the Ford Fiesta driven by defendant across the border "was even sold in the United States."  The record shows the defense objected to the question on the grounds of relevance and lack of foundation.  The court in response stated, "Lay a further foundation."  Agent Richardson testified that both he and other officers "research[ed]" the model of defendant's car; that he used the Internet to do the research; and that he was "pretty familiar" with cars given he is involved in cases where cars are used to smuggle drugs across the border.

The record shows when Agent Richardson was again asked whether the model of Ford Fiesta defendant was driving was sold as a new car in the United States, the defense again objected, but this time only on the ground of lack of foundation.  The court overruled the objection, and Agent Richardson confirmed that model was not sold as a new car in the United States, but rather was a "Mexico-only version."

2.  Forfeiture

"Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.' "  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.)  Courts have consistently held that a defendant's failure " ' " 'to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." ' "  (*Ibid.*)

18

Following the same logic, an " 'appellate court's review of the trial court's admission of evidence is then limited to the stated ground for the objection. (Evid. Code, § 353.)' (*People v. Kennedy* (2005) 36 Cal.4th 595, 612.) 'What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, *but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial*. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' (*People v. Partida* (2005) 37 Cal.4th 428, 435.)" (*People v. Abel* (2012) 53 Cal.4th 891, 924 (*Abel*), italics added; see *People v. Partida* (2005) 37 Cal.4th 428, 435 [noting " 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility' "].)

Here, the record clearly shows defense counsel objected only on relevancy and foundational grounds to Agent Richardson's testimony that the make of the Ford Fiesta driven by defendant was never sold as a new car in the United States. The record also clearly shows that defendant is *not* challenging the admission of this evidence on such grounds, but rather only on the ground such evidence was hearsay. We thus conclude

19

defendant has forfeited this claim on appeal, inasmuch as his failure to object at trial on hearsay grounds precluded the prosecutor from establishing its admissibility.

Perhaps anticipating this conclusion, defendant also contends defense counsel was ineffective for failing to object on hearsay grounds to this evidence.  We turn next to that issue.

3.  Ineffective Assistance of Counsel

It is well recognized that to prevail on an ineffective assistance of counsel claim, a defendant must prove two elements: (1) trial counsel's deficient performance; and (2) prejudice as a result of that performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  Deficient performance is established if the record demonstrates counsel's representation "fell below an objective standard of reasonableness under the prevailing norms of practice."  (*In re Alvernaz* (1992) 2 Cal.4th 924, 937.)

Further, even where it appears counsel's performance was deficient, the judgment must "be upheld unless the defendant demonstrates prejudice, i.e., that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' "  (*People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).)

Here, assuming *without* deciding that defense counsel's performance was deficient for failing to object on hearsay grounds to the testimony of Agent Richardson that his research showed the model of the Ford Fiesta driven across the border by defendant was

20

never sold as a new car in the United States,[3] we conclude there is no reasonable probability the outcome of the trial would have been different.

That is, merely because Agent Richardson testified this model of car was not initially sold in the United States does not mean ipso facto that this particular car never entered the United States, which, under Professor Alfaro's first "hypothesis," was when the drugs were most likely placed inside. Indeed, the only evidence in the record regarding the car's history was that defendant purchased it in Tijuana about three months before his arrest from a "gentleman" on the "streets." Thus, it is pure speculation whether *this* car was *ever* in the United States, regardless of whether that model of car was *sold* as a new car in the United States. In short, we conclude the challenged testimony of Agent Richardson is of little or no relevance, and, thus, there is not a reasonably probability that its admission *or* exclusion affected the outcome of this case.

Our conclusion on this issue is further bolstered by the fact that during closing, defense counsel not once relied on Professor Alfaro's hypothesis that defendant's car entered Mexico from the United States. Instead, defense counsel relied on Professor Alfaro's "weaker" hypothesis that the drugs could have been placed in defendant's car when defendant left it with a mechanic for about three hours, about eight days before his

---

3       In formulating his or her opinion and relating it to the jury, it is well established that an expert may rely on hearsay evidence and, within the discretion of the trial court, even recite the hearsay statements verbatim. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 509.) Furthermore, "[i]f the statement is received as proof of something other than the truth of the statement itself, it is not hearsay." (*People v. Harvey* (1991) 233 Cal.App.3d 1206, 1220 [concluding trial court did not err in admitting into evidence "pay-owe ledgers" because they were admitted as circumstantial evidence of cocaine sales and conspiracy, not for the truth of their contents].)

21

arrest. Clearly, the jury rejected that hypothesis and its underlying theory that defendant was merely a blind mule when it reached guilty verdicts.

On this record, we reject defendant's contention his counsel was ineffective for failing to object this particular testimony by Agent Richardson. (See *People v. Cox* (1991) 53 Cal.3d 618, 699 [noting that failure of either prong is fatal to establishing ineffective assistance of counsel], disapproved on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)

B. *Opinion Testimony*

Defendant next contends the court erred when it allowed Agent Petonak to opine that defendant was not a blind mule under the circumstances of this case. We disagree.

First, as before, defendant has forfeited this claim because there was no objection to Agent Petonak's opinion that defendant was not a blind mule. (See *Abel*, *supra*, 53 Cal.4th at p. 924.)

Second, defendant's counsel was not ineffective for failing to object to such testimony. Indeed, while it is true that an expert cannot opine concerning the guilt or innocence of a defendant, " '[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' (Evid. Code, § 805 . . . .)" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

Here, Agent Petonak did not opine on defendant's guilt or innocence. Rather, he relied on various factors to opine that defendant was not a blind mule, including: the

22

quantity, type and location of the drugs found in defendant's car; defendant was neither a United States citizen nor did he have SENTRI clearance; defendant's car was licensed in Mexico; defendant did not frequently cross the border in his car, and, thus, there was no predictable pattern in contrast to someone who lived in Mexico and worked in the United States; and the lack of a GPS device to track the large quantity of drugs found in the car. Such testimony was not improper. (See Evid. Code, § 801, subd. (a) [providing expert witness testimony is admissible if it relates to a "subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"].)

Although defendant takes issue with Agent Petonak's testimony, we note that his own expert, Professor Alfaro, also relied on many of these *same* factors in discussing a "typical" blind mule case. Defendant also does not take issue with the fact that Professor Alfaro opined that he *was* a blind mule, based on two "hypotheses" as discussed *ante*. In our view, what is "sauce for the goose is sauce for the gander." We thus reject defendant's contention there was error when Agent Richardson testified defendant was not a blind mule under the circumstances of this case.

III

Additional Presentence Credits

Finally, defendant contends he is entitled to seven additional presentence credits because the court in its May 8, 2015 pronouncement of judgment order relied on the probation report that mistakenly provided defendant was arrested on November 25, when in fact he was arrested on November 22, 2014. The People agree, as do we. Thus,

23

defendant was in actual custody for 168 days, as opposed to the 165 days provided in the May 8 order.  Defendant is therefore entitled to 168 days of actual credit and 168 days of conduct credit under Penal Code section 4019, subdivision (f), for a total of 336 days.

DISPOSITION

The trial court is directed to correct its May 8 pronouncement of judgment (and the abstract of judgment, which was not included in the record) to show an award of 168 days of actual credit and 168 days of conduct credit, for a total of credit of 336 days. (Pen. Code, § 4019, subd. (f).)  The court is further directed to notify the Department of Corrections and Rehabilitation of this correction.  In all other respects, the judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:


NARES, J.


McDONALD, J.