Filed 9/29/25  P. v. Guido CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAYMOND ANGELO GUIDO,<br><br>Defendant and Appellant. | F087784<br><br>(Super. Ct. No. F23905847)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Corinne D. Heinstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Raymond Angelo Guido was found guilty by a jury of first degree special-circumstance murder, second degree robbery, and unlawful possession of a firearm. Defendant now appeals his conviction, asserting (I) the trial court prejudicially erred and violated his federal due process rights by (a) allowing the primary detective to testify about the contents of surveillance footage and (b) failing to exclude evidence of uncharged misconduct, unrelated to the charges, from hours prior to the killing. Defendant also argues (II) the cumulative effect of these errors was prejudicial. The People disagree in all respects.

We affirm.

## PROCEDURAL HISTORY

On August 30, 2023, the District Attorney of Fresno County filed an information charging defendant with first degree special-circumstance murder of Luis Alberto Castillo (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17); count 1), second degree robbery (Pen. Code, § 211; count 2), and possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 3). The information alleged, as to counts 1 and 2, that defendant personally and intentionally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)). As to all counts, the information further alleged that defendant had suffered a prior "strike" conviction within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

On November 28, 2023, the jury found defendant guilty of all charges and found all special allegations true. On February 8, 2024, the trial court sentenced defendant to an aggregate term of four years, plus 25 years to life, plus life without the possibility of parole as follows: on count 1, life without the possibility of parole, plus a term of 25 years to life for the firearm enhancement; on count 2, six years, plus 25 years to life for the firearm enhancement, stayed pursuant to Penal Code section 654; and on count 3, four years. Defendant filed a notice of appeal on March 21, 2024.

## FACTUAL SUMMARY

On December 30, 2022, at about 5:55 p.m., Castillo went for a walk, taking his wallet and phone with him. Minutes after leaving his residence in southeast Fresno, he was shot three times at a nearby intersection. Castillo succumbed to his injuries hours later, and his wallet and phone were not found at the scene or collected with his personal belongings at the hospital.

Multiple witnesses testified they saw two individuals on foot in the area at the time of the shooting, including one witness who thought one of the individuals had a gun. The witnesses provided some descriptions of the two, but none positively identified either individual or connected them directly with the shooting. Fresno Police Detective Mark Yee, the primary detective assigned to the case, testified that law enforcement's early investigation consisted of gathering and examining surveillance footage from neighboring homes and businesses. This included footage from a house on the southeast corner of the intersection of the shooting (the shooting-intersection house); a house south of the shooting, on the same north-south street as the shooting (the south house); a house west of the shooting, on the same east-west street as the shooting (the west house); an elementary school west of the shooting and the west house (the elementary school); a business southwest of the shooting (the southwest business); and a house northwest of the shooting, across from defendant's apartment complex (defendant's neighbor's house). Yee described much of the footage as "blurry" or "hard to see," save for the footage from defendant's neighbor's house. Concurrent with the prosecution's presentation of the footage to the jury, Yee testified about what he observed in the footage and how these observations led him to focus his investigation on defendant.

Additionally, the prosecution introduced footage that more clearly showed defendant in the neighborhood in the hours before the shooting; therein, defendant was shown brandishing a knife outside his neighbor's house and fist-fighting with an unidentified person outside the elementary school.

3.

The prosecution also introduced defendant's statements to law enforcement that, on the day of the shooting, he had only left his house to go to the store in the morning, had not been around the elementary school for any reason throughout the day, and did not have a gun or knife at that time. The prosecution presented evidence of defendant's change in appearance immediately after the shooting, including: (1) defendant's parole officer's testimony that defendant had long hair down to his mid-back until a few days after the shooting when he answered the door completely bald and clean shaven; and (2) Yee's observation that, half an hour after the shooting, footage from defendant's neighbor's house showed defendant with his dark hair in a short ponytail and with his face clean shaven (alongside a change of clothing). Yee also discovered Castillo's wallet on the roof of defendant's apartment complex while going to interview defendant's sister on February 28, 2023.

Defendant denied knowledge of the shooting when interviewed by law enforcement in early 2023. At trial, defense counsel cross-examined Yee concerning footage that showed multiple people in similar clothing in the area around the time of the shooting; this included footage from just after the shooting that counsel argued showed two other people entering a home near the west house. Defense counsel also highlighted throughout the trial certain inconsistencies in witnesses' statements, the discovery of ammunition in a vehicle stopped by officers shortly after the shooting matching the caliber used in Castillo's murder, and evidence that the gun used in Castillo's murder was used in another shooting committed after defendant entered drug rehab in mid-January 2023. Finally, defense counsel highlighted that a search of defendant's residence on January 17, 2023, revealed nothing of relevance to the investigation, including the wallet discovered on the roof over a month later.

**DISCUSSION**

I.      **Admission of Testimony Regarding Surveillance Footage and Evidence of Uncharged Misconduct**

      A.      *Standard of Review*

On appeal, the admission or exclusion of evidence is reviewed under the deferential abuse of discretion standard.  (*People v. McKinnon* (2011) 52 Cal.4th 610, 655 (*McKinnon*).)  When an error is one of nonstructural state law, an appellate court follows the harmlessness standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  This standard requires affirmance of the judgment unless the court concludes there is a reasonable probability a result more favorable would have been reached in the absence of the error.  (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050 (*Richardson*).)

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*."  (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).)  For the erroneous admission of evidence to render a trial fundamentally unfair, the evidence must have been " ' "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." ' "  (*People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025–1026.)

      B.      *Primary Detective's Testimony About the Contents of Surveillance Footage*

Defendant's first point on appeal is multifaceted.  He argues portions of Detective Yee's testimony should have been excluded as (a) "oral testimony to prove the contents of a writing" under the "secondary evidence" rule of Evidence Code section 1523,[1] (b) minimally probative and highly prejudicial under section 352, and (c) fundamentally

---

[1]      Undesignated statutory references are to the Evidence Code.

unfair under the due process clause of the Fourteenth Amendment. Defendant also argues these issues were properly preserved for appeal or, if forfeited, defense counsel was ineffective in failing to properly object.

The People contend the secondary evidence issue is forfeited and, regardless, all of defendant's arguments fail either on the merits or for lack of prejudice.

### 1. Additional Background

On October 27, 2023, defendant moved to prevent witnesses, including Yee, from identifying defendant in the surveillance footage or otherwise testifying about the contents of the footage. The trial court held a hearing on these issues on October 30, 2023.

Over multiple days of the trial, Yee was questioned about the collected footage from the shooting-intersection house, the south house, the west house, the elementary school, the southwest business, and defendant's neighbor's house. Throughout this testimony, Yee noted the low quality of much of the footage, save for the footage from defendant's neighbor's house. Yee relayed many of his observations about the footage in the minutes during and after the shooting, including the footage from (1) the shooting-intersection house, which Yee stated showed five flashes of light, one figure fall to the ground, and two other figures run away; (2) the south house, which he stated "noted the time that the gunshots were heard" but did not show anyone running by in the moments after the shooting, and which led him to believe the two individuals did not run to the south, "so that . . . narrowed [the] focus" of the investigation westward; (3) the west house, which he described as "blurry" footage showing two individuals, one in light-colored shoes and the other in darker shoes, a hood, and dark hair, run west toward the elementary school immediately after the shooting; (4) the elementary school and the southwest business, which he stated showed the two individuals run from the east-west street where the shooting occurred and split up, and showed the one "dark hair[ed]" individual in "dark shoes, with . . . a light top . . . near the [shoe]lace[s]" eventually move

6.

northward toward defendant's neighbor's house; and (5) defendant's neighbor's house, "[e]xtremely" better quality footage which showed a person with dark hair, a hooded sweatshirt, pants, and shoes who resembled the northbound person from the elementary school footage, also showing the person had tattoos, long hair, a goatee, and other features consistent with defendant. Additionally, Yee testified the footage from defendant's neighbor's house captured an individual with similar characteristics exiting the apartment complex about half an hour after the shooting in different clothes and with his hair cut shorter and his goatee shaven. Yee also described footage from the time before the shooting, including his observations of two individuals in similar clothing as those he saw in the post-shooting footage leave defendant's apartment complex about 10 minutes before the shooting, eventually run towards the north-south street where the shooting occurred, and walk with Castillo near the shooting-intersection house a few minutes before the shooting.

On cross-examination, Yee agreed some footage showed other activity in the neighborhood at the time, including other people wearing dark clothing. Throughout his trial testimony, Yee did not explicitly name defendant as any of the individuals in the footage until there was a clear picture of defendant in his neighbor's house footage about six minutes after the shooting. At times throughout Yee's testimony, the court reminded the jurors they were "the ultimate finders of fact" as concerned the identity of the shooter.

### 2. Forfeiture and Ineffective Assistance of Counsel

We begin with the parties' competing arguments as to whether defense counsel forfeited defendant's challenges to Yee's testimony. (See § 353 [requiring an objection to preserve for appeal a claim concerning erroneously admitted evidence]; *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 [" 'Failure to raise specific challenges in the trial court forfeits the claim on appeal.' "].) Defendant contends his arguments are not forfeited, noting the specific briefing in his pretrial motion in limine on secondary evidence, section 352 balancing, and due process, as well as defense counsel's arguments

7.

at the in limine hearing. The People contend the secondary evidence issue is forfeited, arguing defendant abandoned this position at the pretrial hearing and failed to make any objections at trial on secondary evidence grounds.

Anticipating the People's argument, defendant contends if defense counsel did not properly preserve any issue, he was ineffective in doing so. The People dispute this contention. A criminal defendant may claim ineffective assistance on direct appeal where defense counsel failed to object to the admission of evidence. (See *People v. Romo* (2016) 248 Cal.App.4th 682, 695–697.) This requires asking whether counsel's acts " ' " 'fell below an objective standard of reasonableness . . . [causing] prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653; see *Strickland v. Washington* (1984) 466 U.S. 668, 688–692; see also *Richardson, supra*, 43 Cal.4th at p. 1050 [discussing the similarities between the *Watson* "reasonable probability" standard for state law error and the similarly-phrased *Strickland* prejudice prong for ineffective assistance]; *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [noting *Watson*'s harmless error standard is substantially the same as *Strickland*'s prejudice prong].)

Because we can resolve defendant's claims on the merits and for lack of prejudice, we dispense with a lengthy analysis of whether defendant forfeited the secondary evidence issue on appeal. (See *People v. McDaniel* (2021) 12 Cal.5th 97, 132.)

### 3. Analysis

#### a. Secondary evidence under section 1523

Defendant first contends the investigator's testimony describing what the footage depicted was a violation of section 1523 because it was "oral testimony . . . to prove the contents of a writing." We find no error and, in any event, no prejudice.

Video recordings are writings, and to be admissible into evidence, must either be the original, or otherwise admissible secondary evidence of the content of the footage.

(§§ 250, 1520–1523.) Oral testimony to prove the content of a writing is generally inadmissible (§ 1523, subd. (a)), save for a few enumerated exceptions (*id.*, subds. (b)–(d)) inapplicable here. We review the trial court's ruling concerning the admissibility of secondary evidence for abuse of discretion and will reverse only if there is a reasonable probability a result more favorable to defendant would have been reached in the absence of the error. (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1069 [noting the admission of secondary evidence is "addressed to the discretion of the trial court, and will not be disturbed on appeal absent abuse of discretion"]; *Watson, supra*, 46 Cal.2d at p. 836; *Richardson, supra*, 43 Cal.4th at p. 1050.)

Here, one of the main disputes in this trial was the identity of the shooter, as there were no eyewitnesses to the shooting and much of the footage was low quality and only showed blurry figures. Neither party disputes this, nor do they dispute that the footage from defendant's neighbor's house was the only one of quality where defendant could be more readily identified. The question is whether Yee was permitted to describe to the jury details of the low-quality footage from the shooting-intersection house, the south house, the west house, the southwest business, and the elementary school. For support, the People point to *People v. Gonzalez* (2021) 12 Cal.5th 367, 410–411 (*Gonzalez*) and *People v. Son* (2020) 56 Cal.App.5th 689, 695–696, wherein no abuse of discretion arose from the trial courts' allowance of testimony from law enforcement about the contents of footage showing the crimes. As here, the defendants in those cases argued the testimony should have been excluded under section 1523, but in both cases the court affirmed, noting the footage had been admitted into evidence and the testimony only provided context to the footage. (See *Gonzalez*, at pp. 410–411; *Son*, at pp. 695–696.)

Defendant is correct that his case is partially distinguishable from *Gonzalez*. There, the detectives who described the footage were undercover agents with personal knowledge of the conversations depicted, and their testimony was used to "clarify what was being discussed" and "explain the meaning of certain slang terms." (*Gonzalez,*

*supra*, 12 Cal.5th at p. 410.) Conversely, the investigator here only reviewed the footage after it was collected and testified about his observations of the footage. Despite this, our Supreme Court in *Gonzalez* recognized no court has applied the secondary evidence rule "when the writing itself was admitted into evidence." (*Ibid.*) The court cited *Son* approvingly for the same proposition. (*Ibid.*) The *Gonzalez* court explicitly reiterated, " 'The purpose of the [secondary] evidence rule is "to minimize the possibilities of misinterpretation of writings by requiring the production of the original writings themselves, if available." ' " (*Ibid.*) This court's own research indicates this principle has long existed under California law, stretching back to when the rule was known as the "best evidence" rule. (*People v. Sloss* (1973) 34 Cal.App.3d 74, 86 [finding the best evidence rule was not violated by an officer's testimony about the contents of a photograph because "the original 'writing' [citation] was produced in evidence"].) Given that the jury here had access to the footage in this case, *Gonzalez*, *Son*, and *Sloss* counsel a finding of no error under section 1523. However, even assuming arguendo the admission of Yee's descriptions of the footage was error under subdivision (a) of section 1523, we find no prejudice. (See *Partida, supra*, 37 Cal.4th at p. 439 ["Absent fundamental unfairness [under federal due process doctrines], state law error in admitting evidence is subject to the traditional *Watson* test."].) Under the *Watson* standard, a judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836; see also *Richardson, supra*, 43 Cal.4th at p. 1050.)

No such probability exists on this record. In addition to Yee's description of the details of the footage, defendant made inconsistent statements to law enforcement that, on the day of the shooting, he had only left his house to go to the store in the morning, had not been around the elementary school for any reason throughout that day, and did not have a gun or knife at that time. This despite footage from earlier in the day showing defendant in the neighborhood outside the elementary school and the southwest business

brandishing a knife. The prosecution introduced evidence concerning defendant's change in appearance immediately after the shooting, including that he shaved off his long hair and goatee. Multiple officers testified about the discovery of Castillo's wallet on February 28, 2023, which Yee found on the roof of defendant's apartment complex. And, as defendant readily admits, the jury had access to the footage and could watch any clip "as many times as necessary to determine what they believed was depicted in them." On the key issue of identity, the court repeatedly reminded the jurors they were "the ultimate finders of fact," and we presume the jury followed the court's admonitions. (See *People v. Gray* (2005) 37 Cal.4th 168, 217 (*Gray*).) Thus, we find no reasonable probability a result more favorable to defendant would have been reached had Yee's descriptions of the footage been excluded. (See *Watson, supra*, 46 Cal.2d at p. 836; *Richardson, supra*, 43 Cal.4th at p. 1050.)

> b.      *Balancing under section 352*

Next, defendant contends much of Yee's testimony should have been excluded under section 352 as unduly time consuming, prejudicial, or confusing. We disagree and find no prejudice.

Section 352 requires trial courts to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The court's decision under section 352 will not be disturbed on appeal absent a clear abuse of discretion and *Watson* prejudicial error. (*McKinnon, supra*, 52 Cal.4th at p. 655 ["On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible."]; *Watson, supra*, 46 Cal.2d at p. 836.)

Here, we find no abuse of discretion under section 352 in the trial court's decision to allow Yee to testify as to the contents of the footage. (See *McKinnon, supra*, 52 Cal.4th at p. 655.) The testimony did not unduly consume time, as defendant argues.

11.

True, Yee was on the stand for three days of the month-long trial, adding up to over 100 pages of the reporter's transcript. However, he did not spend all of this time describing the contents of the footage, testifying to other aspects of the investigation, providing foundation for the admission of the footage, and remaining on the stand while both parties played the footage for the jury. Defendant does not argue it was improper for Yee to take the stand at all and readily admits it was "proper to admit testimony about the *locations* of the surveillance cameras." On these facts, the trial court did not abuse its discretion under section 352 due to an undue consumption of time. (See § 352, subd. (a); *People v. Cabrera* (2007) 152 Cal.App.4th 695, 706 [finding no undue consumption of time where the witness's testimony spanned almost 100 pages of the reporter's transcript but concerned a core issue in the case].)

Nor were Yee's descriptions unduly prejudicial or confusing on the issue of identity. While the shooter's identity was central to the case, a review of Yee's testimony demonstrates he never explicitly identified defendant as any of the individuals in the footage until there was a clear image of defendant in the footage from his neighbor's house, about six minutes after the shooting. Defendant argues the jury may have unthinkingly deferred to Yee's opinion that the shooter, a blurry figure in much of the footage, was the same person as in the footage from the neighbor's house, which more clearly showed defendant.[2] However, the court reminded the jurors they were "the ultimate finders of fact" as concerned the identity of the shooter, and we presume the jury followed the court's instructions. (See *Gray, supra*, 37 Cal.4th at p. 217.) The jury had access to all the footage during deliberations, and defendant was able to present his competing theories about the identity of the shooter during his cross-examinations of Yee

---

[2] This argument often arises on appeal in the context of lay testimony. (See, e.g., *Gonzalez, supra*, 12 Cal.5th at pp. 411–412.) Though defendant avers at times that Yee's testimony may have invaded the province of the jury, he makes no explicit argument that the trial court abused its discretion under lay opinion principles. We therefore do not consider that question.

and other witnesses. On these facts, we find no section 352 violation. (See *People v. Tran* (2020) 50 Cal.App.5th 171, 190 [finding no abuse of discretion under section 352 where the declarant described details in surveillance footage to "help[] the jury observe what the videos showed," where "[t]here was nothing sensational about his testimony," and where the jury could observe the footage for themselves]; *People v. Thomas* (2023) 14 Cal.5th 327, 363 [noting prejudicial is not synonymous with damaging for section 352 purposes, but instead refers to " ' " 'evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues' " ' "].)

Further, for the same reasons as stated in the section 1523 discussion above, we find no prejudice in the admission of Yee's testimony. Briefly: (1) The jury was able to view all of the footage at issue and presumably followed the court's instructions to be the finders of fact regarding the identity of the shooter; (2) Defendant made inconsistent statements concerning his whereabouts on the day of the shooting—despite footage to the contrary; (3) Defendant changed his appearance immediately after the shooting, such that his parole officer did not recognize him; and (4) Yee discovered Castillo's wallet on the roof of defendant's apartment complex. (See *Watson, supra*, 46 Cal.2d at p. 836.)

### c.    Due process

Defendant also contends the trial court's failure to exclude Yee's descriptions of the footage violated his federal due process rights. We disagree.

Federal due process prohibits the admission of evidence rendering the trial fundamentally unfair. (*Partida, supra*, 37 Cal.4th at p. 439.) " 'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.' " (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817 (*Hunt*).)

Here, Yee's testimony did not cut off other possible inferences as to the identity of the shooter. As noted above, Yee did not identify defendant as any of the individuals in the footage until there was a clear picture of him in the footage from his neighbor's

house, about six minutes after the shooting. Defense counsel took advantage of his opportunity to cross-examine Yee and other witnesses to present his competing theories about the identity of the shooter, including that there were others in similar clothing besides defendant outside in the neighborhood that night. The court repeatedly admonished the jurors to be "the ultimate finders of fact" as concerned the identity of the shooter, and we presume the jury followed the court's instructions. (See *Gray, supra*, 37 Cal.4th at p. 217.) Thus, the jury was free to decide whether the blurry figure seen shooting Castillo was not defendant but some other individual in the neighborhood at the time. They did not. On these facts, we do not find Yee's descriptions of the footage rendered the trial so arbitrary and fundamentally unfair that it violated federal due process. (See *Partida, supra*, 37 Cal.4th at p. 439; *Hunt, supra*, 196 Cal.App.4th at p. 817.)

### C. *Footage of Defendant from Hours Prior to the Killing*

Defendant's second argument concerns footage from hours before the shooting showing defendant brandishing a knife outside his neighbor's house and fighting with an unnamed person outside the elementary school. Defendant contends these should have been excluded as (a) irrelevant, as character and propensity evidence, and as unduly prejudicial and confusing, and (b) fundamentally unfair under the Fourteenth Amendment due process clause.

The People contend defendant's arguments fail on the merits, arguing the footage was used to prove identity and inconsistent statements. We agree and find no prejudice.

#### 1. Additional Background

Defendant told law enforcement in early 2023 that, on the day of the shooting, he had only left his house to go to the store in the morning, had not been around the elementary school for any reason throughout that day, and did not have a gun or knife at that time. The prosecution presented footage from defendant's neighbor's house, recorded about three hours before the shooting, showing defendant approach that house

14.

holding a large knife. According to testimony from a resident at defendant's neighbor's house, a friend of hers had gotten into an altercation with defendant on the afternoon of the shooting near the elementary school. The prosecution introduced footage from the elementary school showing the altercation. Yee described the footage from defendant's neighbor's house from earlier in the day as "[e]xtremely" better quality footage, which showed defendant's tattoos and other features. The prosecution also introduced evidence concerning defendant's change in appearance immediately after the shooting, including that he shaved his long hair and goatee.

### 2. Analysis

#### a. *Relevance, section 1101 propensity, and section 352 balancing*

Defendant contends the footage from hours before the shooting was irrelevant, as it had nothing to do with the shooting. He also argues that because the footage shows him fighting and brandishing a knife, it should have been excluded as impermissible propensity evidence, and as minimally probative and unduly prejudicial. We disagree and find no prejudice.

Only relevant evidence is admissible. (§ 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) This includes "evidence relevant to the credibility of a witness or hearsay declarant." (*Ibid.*) Evidence of a defendant's prior bad acts is not admissible to show bad character or predisposition to criminality. (§ 1101, subd. (a).) However, such evidence is admissible if relevant to prove a material fact at issue, including identity. (*Id.*, subd. (b); *People v. Cage* (2015) 62 Cal.4th 256, 273.) Finally, a trial court may "exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice [or] of confusing the issues." (§ 352.) State law evidentiary rulings will not be disturbed on appeal absent a clear abuse of discretion. (*McKinnon, supra*, 52 Cal.4th at p. 655; *People*

15.

*v. Memro* (1995) 11 Cal.4th 786, 864 ["We review the admission of evidence under . . . section 1101 for an abuse of discretion."].)  We may only reverse for evidentiary error if, after considering the entire record, we believe there was a reasonable probability of a different outcome in the absence of the error.  (*Watson, supra*, 46 Cal.2d at p. 836.)

The identity of the shooter was a key dispute in this case.  Multiple witnesses saw two individuals on foot in the area at the time of the shooting, including one witness who thought one of the individuals had a gun; the witnesses provided general descriptions of the two, but none positively identified either individual or connected them directly with the shooting.  Much of the footage collected by law enforcement was "hard to see" and showed "blurry" figures.  At trial, defense counsel questioned Yee about footage showing multiple people in similar clothing in the area around the time of the shooting, including footage from just after the shooting that he argued showed two other people entering a home near the west house.  Defense counsel also highlighted inconsistencies in witnesses' statements about the descriptions of individuals in the area at that time.  Further, when defendant was interviewed by law enforcement in early 2023, he stated he had only left his house to go to the store in the morning, had not been around the elementary school for any reason throughout the day, and did not have a gun or knife at that time.  He also stated he shaved his long hair and goatee as a new year's resolution.

Given this, circumstantial evidence establishing the identity of the "blurry" figures was relevant to a key issue in the case, as well as to defendant's credibility.  The footage from earlier in the day showing defendant in the in the neighborhood outside defendant's neighbor's house and the elementary school was also relevant to establish a baseline of his gait and appearance, including his tattoos and long hair, that the jury could compare against the footage from these same cameras six minutes after the shooting.  (See *People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 771 [noting identity can be shown via common distinctive features]; *People v. Valdez* (2012) 55 Cal.4th 82, 131

16.

[finding photographs unrelated to the crime at issue not barred under section 1101 because the defendant's tattoos and other identifying characteristics could be used to prove identity]; *People v. Peralez* (1971) 14 Cal.App.3d 368, 377 [noting images from a different time from the time of the charged crime could be relevant to identity where the defendant's appearance changed].) The footage also called into question defendant's statements to law enforcement in early 2023 that he only left the house the morning of the shooting and did not have a knife or gun, which went to defendant's credibility. (See *People v. Abel* (2012) 53 Cal.4th 891, 928 [noting section 1101 explicitly allows for "evidence [] offered on the issue of a witness's credibility"].) Given these alternate permissible and relevant uses, the trial court did not abuse its discretion under section 1101 in allowing this footage to be admitted into evidence. (*People v Memro, supra*, 11 Cal.4th at p. 864.)

Further, the trial court did not abuse its discretion in admitting this footage due to the risk of undue prejudice or confusion of the issues. Though the jury saw defendant with a knife and in a fight earlier on the day of the shooting, the discussion of these instances was relatively brief in comparison to the other evidence presented at trial, and as the court noted about the fight, defendant appeared more a victim than an aggressor. Given the murder charge, these instances were less emotionally provoking. (See *People v. Thomas, supra*, 14 Cal.5th at p. 363 [reminding under section 352, prejudicial refers to " ' " 'evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues' " ' "].) And, again, the court continually admonished the jurors they were "the ultimate finders of fact" as concerned the identity of the shooter. We presume the jury followed the court's instructions. (See *Gray, supra*, 37 Cal.4th at p. 217.) On these facts, we find no abuse of discretion under section 352. (See *McKinnon, supra*, 52 Cal.4th at p. 655; *People v. Cage, supra*, 62 Cal.4th at pp. 274–275 [finding no abuse of discretion in the trial court's admission of evidence over the defendant's section 352 and 1101 objections and showing

17.

prior bad acts where evidence was relevant to motive and identity, where it was not *unduly* prejudicial for lack of emotional bias and effect on the issues, and where the jury was properly instructed on the role of this evidence].)

Finally, for the same reasons as discussed in part I.B.3.a. above, we find no prejudice in the admission of the footage from defendant's neighbor's house and the elementary school from earlier in the afternoon. Thus, there is no reasonable probability a result more favorable to defendant would have been reached had the challenged footage been excluded. (*Watson, supra*, 46 Cal.2d at p. 836.)

### b. Due process

Defendant also contends the trial court's failure to exclude the footage from defendant's neighbor's house and elementary school from the afternoon violated his federal due process rights. We disagree.

Federal due process principles prohibit the admission of evidence rendering the trial fundamentally unfair. (*Partida, supra*, 37 Cal.4th at p. 439.) " 'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.' " (*Hunt, supra*, 196 Cal.App.4th at p. 817.)

Here, the footage from defendant's neighbor's house and the elementary school from the afternoon did not foreclose the jury's ability to infer another individual was the shooter. The footage was from earlier in the day, and though defendant could be clearly identified in the footage from his neighbor's house, the jury was free to accept defendant's argument that the shooter was one of the other individuals in the area at the time of the shooting. The jury also could have accepted that defendant's inconsistent statements to law enforcement had more to do with his desire to not get caught for fighting and brandishing a knife, as defendant now argues. Thus, the jury was free to decide the blurry figure seen shooting Castillo was not defendant but was in fact some other individual in the neighborhood at the time. (See *Hunt, supra*, 196 Cal.App.4th at p. 817.)

On these facts, we conclude the jury's exposure to the footage from defendant's neighbor's house and the elementary school from hours before the shooting did not "render[] the trial so arbitrary and fundamentally unfair that it violated federal due process." (*Partida, supra*, 37 Cal.4th at p. 439.)

## II.  Cumulative Effect

Defendant contends that even if the errors alleged above are not in themselves reversible, they are cumulatively prejudicial.  Not so.  "A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)  Defendant's individual arguments fail on the merits, and even accepting error for the sake of argument under section 1523, we found this issue not prejudicial in itself.  Thus, there is nothing to cumulate.  As such, we reject defendant's claim of cumulative error resulting in prejudice.  (See *People v. Panah* (2005) 35 Cal.4th 395, 479–480 [rejecting cumulative error where the defendant demonstrated few errors, and the court found each possible error harmless when considered individually].)

## DISPOSITION

The judgment is affirmed.


HILL, P. J.

WE CONCUR:


LEVY, J.


SNAUFFER, J.


19.